(No. 22687.—)

. THE CHICAGO DAILY NEWS, INC., Defendant in Error, *vs.*
MARY EVERETT KOHLER, Admx., Plaintiff in Error.

*Opinion filed April 12, 1935—Rehearing denied June 5, 1935.*

WINSTON, STRAWN & SHAW, (EDWARD W. EVERETT, of counsel,) for plaintiff in error.

FISHER, BOYDEN, BELL, BOYD & MARSHALL, (THOMAS L. MARSHALL, and DAVID A. WATTS, of counsel,) for defendant in error.

Mr. JUSTICE FARTHING delivered the opinion of the court:

The Chicago Daily News, Inc., sued G. A. Edward Kohler in assumpsit in the circuit court of Cook county and alleged a breach of a written contract. Kohler pleaded the general issue and filed a plea of set-off. He died prior to the trial. His widow, Mary Everett Kohler, was substituted as administratrix of his estate. The jury found the plaintiff entitled to $48,700 damages, and judgment was rendered upon the verdict. The Appellate Court for the First District affirmed the judgment. We granted a writ of *certiorari,* and the case is here for a further review.

The plaintiff publishes a newspaper in Chicago. G. A. Edward Kohler, doing business under the name of Kohler Brothers, at the time of the execution of the contract sued on was manufacturing the Kohler magazine reel, a patented apparatus for feeding paper to printing presses. His factory was located at Mishawaka, Indiana. The reel was invented in the plant of the Chicago Daily News Company (not to be confused with the plaintiff, which was incorporated in 1925,) by one Irving Stone, an employee, who assigned his rights to the invention to Kohler. On July 15, 1907, prior to the issuance of a patent, Kohler and his brother in writing granted a license to the Chicago Daily News Company "to use roll supports of the kind described and claimed in the application filed in United States patent office June 18, 1900, serial No. 20682, in connection with the plant of the Chicago Daily News in the city of Chicago, county of Cook and State of Illinois, the right

to use these roll supports covering the printing of all papers printed on presses of the plant." On January 12, 1915, letters patent covering the reel were issued to Kohler. On July 27, 1927, Kohler submitted to the plaintiff a proposal providing in part:

"We propose to furnish 72 Kohler magazine reels per specifications attached and made a part of this contract, for use in the plant of Chicago Daily News at Chicago, Illinois, subject to the following terms and conditions:

Price for each reel, four thousand dollars ($4,000.00) f. o. b. cars factory.

Total amount of contract Two hundred eighty-eight thousand ($288,000.00) dollars.

Terms of payment: Twenty per cent (20%) in cash upon acceptance of contract by purchaser;

Twenty per cent (20%) thirty (30) days thereafter;

Twenty per cent (20%) sixty (60) days thereafter;

Twenty per cent (20%) upon shipment;

Twenty per cent (20%) ninety (90) days after shipment.

Proportionate payments shall be made for partial shipments.

Payment in full shall not relieve Kohler Brothers of the guarantees covered by this contract.

Shipment shall be made on or about as specified 19......

It is important that the installation of presses is not delayed because of delay in shipment of the reels, and the above shipping date is set accordingly. Purchaser, therefore, agrees to accept shipment on the specified date.

The apparatus covered by this proposal is built to meet the special requirements of the purchaser, is applicable for this installation only, and this contract is therefore not subject to cancellation for any cause whatsoever.

Foundation for reels, means for supporting belt shaft bearings on press structure, and drives for connecting the belt shaft to the press shall be furnished by purchaser in accordance with drawings approved by Kohler Brothers.

Purchaser shall furnish, or direct other interested parties to furnish, without expense to Kohler Brothers, all drawings, written data and dimensions which are in Kohler Brothers' opinion necessary for the installation and operation of the reels; and Kohler Brothers will furnish, without expense, the necessary drawings and data co-ordinating with the data so furnished.

Any delay in securing this data will constitute a proportionate extension of the specified shipping date."

A letter accompanying it was expressly made a part of this proposal. In the letter Kohler credited the plaintiff with $90,000, thus reducing the sale price to $198,000, or $2750 for each of the seventy-two reels. A further allowance of $18,000 was made for fifteen reels then in use in the plaintiff's press-room, which were to be delivered to Kohler. The last paragraph of the letter refers to the $90,000 credit and says: "This allowance is made because of the privilege extended to you in the agreement dated July 15, 1907, conceding your right to use these reels in the plant of the Chicago Daily News." After deducting the two credits there remained $180,000 to be paid, and the plaintiff contends this fixed the price at $2500 per unit for the seventy-two reels. On August 4, 1927, the plaintiff accepted the offer thus made.

The provisions of the contract concerning payment and shipment were modified on November 22, 1927, to read: "20% of the contract price in cash upon acceptance of contract by purchaser; 20% November 25, 1927; 10% February 1, 1928; 10% April 1, 1928; 10% June 1, 1928; 10% August 1, 1928; 10% October 1, 1928; 10% November 1, 1928. Shipment of eight (8) of these reels will be made on or about December 1, 1927. Shipment of the sixty-four (64) remaining reels to be made September 1, 1928." Prior to this modification, and on August 15, 1927, the plaintiff had notified Kohler to deliver eight reels on December 1, 1927. It stated that the other sixty-four reels must be ready when the presses were installed in its new building, and that it expected to have the plant in operation by January 1, 1929.

On November 23, 1927, Kohler accepted the plaintiff's order for two additional reels. In accepting this order he said: "We will treat this order separately from the contract for seventy-two Kohler magazine reels, and will bill them to you when delivered at the price stated in the con-

tract, subject to terms thirty days." On November 30, 1927, confirming its order, the plaintiff wrote Kohler and said: "This letter will serve as confirmation of my verbal order to increase our original order by two (2) magazine reels, these reels to be delivered at the earliest possible date for erection in our experimental building on the West Side. These two reels to be priced at the same rate as the seventy-two (72) reels specified in our contract." The two reels were shipped to the plaintiff on January 6, 1928, and it paid Kohler $2750, each, for them.

Thirty-eight reels were delivered under the original agreement. Of these, eight were shipped in December, 1927, and thirty between September 1 and December 3, 1928. Six payments, aggregating $144,000, were made to Kohler, as follows: Check dated September 7, 1927, for $36,000; check dated December 1, 1927, for $36,000; check dated February 2, 1928, for $18,000; check dated April 6, 1928, for $18,000; check dated June 19, 1928, for $18,000; check dated August 1, 1928, for $18,000.

From time to time prior to August 1, 1928, Kohler requested in express language both the percentage and the corresponding sum of money then due under the modified agreement of November 22, 1927. The plaintiff did not make the payments due on the first days of October and November, 1928.

The eight reels shipped in December, 1927, were installed in the plaintiff's plant. Between August 4, 1927, (the date of the original contract,) and May 16, 1928, the plaintiff changed the design of its presses and press-rooms to economize space. On the day last named it wrote to Kohler and stated that these changes made the use of his magazine reels impossible. It informed Kohler that it would accept no more reels and instructed him to terminate deliveries and to discontinue work. "We hereby notify you," the letter continued, "that said contract is hereby finally canceled and terminated by us. We shall be glad

to discuss with you, at your convenience, the matter of fair reimbursement of such outlay, if any, already made in connection with this contract." Kohler refused to assent to the cancellation. In his answer he stated that in reliance on the contract "we have ordered all these reels and the principal parts of all of them have now been manufactured and we are in position to deliver them in accordance with the contract."

When the design of the printing presses was changed the plaintiff thought a two-arm reel could be used in place of the three-arm reel specified in the contract. This was an entirely different apparatus. Kohler submitted plans for a two-arm reel to be used with the new presses. Extended negotiations followed but no agreement for such reels was ever made and the original contract as modified remained in force. The plaintiff's own design was eventually used and the two-arm reels were constructed by a third party.

On July 17, 1928, the plaintiff offered to sell Kohler the sixty-four undelivered reels at $2500 each. Receipt of this offer appears to have been the first actual notice to Kohler that the plaintiff intended to sell the undelivered reels, although he had known for three months that the plaintiff could not use them. In his reply on July 18 Kohler directed attention to clause 3 of the specifications constituting a part of the contract, which provided that, if possible, he would furnish any special apparatus specified by the purchaser, and requested the plaintiff to supply him with press drawings. For the first time Kohler then claimed that the concession in price precluded the plaintiff from re-selling the reels, and that only if it paid $4000 for each reel was it authorized to re-sell. His letter concluded: "We are prepared to furnish the new device in your test plant to determine the necessary requirements and after tests are made to arrange for additional costs." Many times there-

after Kohler insisted that the plaintiff had no right to sell the reels unless it agreed to pay the standard contract price of $4000 each. The plaintiff was equally insistent that it had purchased absolute title to the reels and could re-sell them.

The plaintiff, in a letter dated July 30, 1928, enclosing a check for $18,000 to Kohler in payment of the August 1, 1928, installment, referred to his rejection of its attempted cancellation of the contract and its subsequent payment of two installments when due and announced that it would insist upon Kohler's performance of the contract. In demanding delivery of the sixty-four remaining reels under the original agreement as modified, the plaintiff stated: "We assume from your letter of May 16, 1928, answering our aforesaid letter of the same date, that these reels have now been manufactured in accordance with the contract and that they will be ready for prompt delivery September 1, 1928. Please be advised that we expect, and shall insist upon, delivery of the sixty-four remaining reels promptly on September 1, 1928, as provided in the aforesaid letter of November 22, 1927." On August 6, 1928, Kohler replied that shipment of the sixty-four reels had been ordered and that they would be delivered at the earliest possible moment, beginning on or about September 1, 1928. Two days later Kohler notified the plaintiff that in the absence of instructions from it he was manufacturing the sixty-four undelivered reels with the same connections as those on the eight already delivered. Between September 1 and December 3, 1928, thirty more reels were shipped. None were shipped thereafter. On January 26, 1929, the plaintiff wrote Kohler that because of his continued default it would accept no further deliveries. Subsequently Kohler sold the thirty-four reels elsewhere for a gross price of $135,110. The average price obtained for them was $3973. The cost of necessary changes and selling was $30,000. Eleven of the old reels Kohler was to

receive from plaintiff were sold by it for junk and brought $300. The other four were not delivered to Kohler.

The trial court instructed the jury that the contract of July 27, 1927, fixed the sale price of seventy-two reels at $2500 each; that the fifteen old reels were to become the property of Kohler, and that the price of $2500 per reel was unaffected by any disposition which the plaintiff had made of reels delivered under the contract. The verdict of $48,700 was arrived at by subtracting from the $144,000 paid to Kohler $95,000, which is the total price of thirty-eight reels at $2500 each, and also subtracting $300 received by the plaintiff in the sale of the eleven old reels.

To obtain a reversal of the judgments of the Appellate Court and the circut court the administratrix contends that the owner of the patent covering the reels had the exclusive right to manufacture, use and sell them; that by the contract Kohler merely conferred upon the plaintiff the right to use the magazine reels unless it paid $4000 for each reel, and that, therefore, when it attempted to sell them it was guilty of a breach which precludes its recovery on the contract. To sustain this contention she maintains that the last paragraph of the letter accompanying the proposal recognized the existence of a license granted in 1907 to the former owner and publisher of the Chicago Daily News allowing the use of the reels in his plant; that neither the plaintiff's shop rights in the patent nor this license gave it the right to sell, and that the license was a limitation which by reference became a part of the contract of July 27, 1927. To sustain the judgment the plaintiff maintains that the contract was one of sale, under which it obtained unrestricted title to the reels at the price of $2500 each.

As the assignee and owner of the patent when the contract in question was executed Kohler enjoyed a monopoly, and, hence, the exclusive right to manufacture, use and sell the patented device. He could grant to others one or more of the rights to make, use or vend under certain circum-

stances, retaining to himself or bestowing, as he elected, the right to make, use and vend under all other circumstances. (1 Walker on Patents, (6th ed.) p. 447; *United States* v. *General Electric Co.* 272 U. S. 476; *Bement* v. *National Harrow Co.* 186 id. 70.) While a patentee may limit a license to making and using the patented article, he may sell it, and if he does, the sale places the article beyond his control as patentee. Thus, where a patentee manufactures the patented device and sells it he can exercise no future control over the article in the hands of the purchaser. (*Boston Store of Chicago* v. *American Graphophone Co.* 246 U. S. 8; *Keeler* v. *Standard Folding Bed Co.* 157 id. 659; *Adams* v. *Burke,* 17 Wall. 453.) The United States Supreme Court, in *Keeler* v. *Standard Folding Bed Co. supra,* said: "One who buys patented articles of manufacture from one authorized to sell them becomes possessed of an absolute property in such articles, unrestricted in time or place." Federal decisions denying the right of patent owners, in selling patented articles, to reserve control over the re-sale or use do not rest upon any mere question of the form of notice attached to the articles, or the right to control, solely by reference to such notice, but upon the basic ground that the control of the patent owner over the articles in question ends with the passing of title. (*Boston Store of Chicago* v. *American Graphophone Co. supra.*) "By virtue of the patent law," the court said in the case last cited, "one who had sold a patented machine and received the price, and had thus placed the machine so sold beyond the confines of the patent law, could not, by qualifying restrictions as to use, keep under the patent monopoly a subject to which the monopoly no longer applied."

An employee who finds an improved method of, or instrument for, doing his work, using the property or labor of his employer to develop his invention into practical form, by assenting to the use of such improvement by his em-

ployer grants to him an irrevocable license to use the invention. Such employee is not entitled, after taking out a patent for it, to recover a royalty or other compensation for such use. (*Gill* v. *United States*, 160 U. S. 426; *Solomons* v. *United States*, 137 id. 342; *McKinnon Chain Co.* v. *American Chain Co.* 259 Fed. 873.) Under the shop rights admittedly held by the plaintiff it could make reels for its own use. The defendant maintains that neither the plaintiff's shop rights nor the license of July 15, 1907, gave the plaintiff the right to sell reels. The plaintiff makes no such claim, but says that its shop rights to make and use the reels did not preclude it from purchasing, or Kohler from selling to it, reels manufactured by him. Neither the shop rights nor license restricted the rights of the parties with respect to future purchases and sales of reels between them. The plaintiff was only obligated to use the reels exclusively on its own presses when it made them. There is nothing in the license agreement of 1907 to prevent the plaintiff from buying from the patentee and then selling the reels so purchased. A special license to re-sell the articles purchased from the patentee was clearly unnecessary. The fact that the subject matter of the contract consisted of patented articles or that the plaintiff had "shop rights" is thus immaterial. Kohler could either sell or convey merely the right to use the reels. It necessarily follows that the determination of whether the contract of July 27, 1927, was one of outright sale or a mere grant of the right to use the reels is dependent upon the contract's terms and not upon principles of patent law.

Examination of the contract discloses that in the printed form used by Kohler the "price" for each reel is specified, and the plaintiff is referred to as the "purchaser" ten times in the proposal and the specifications forming a part of it. The administratrix argues, however, that the language of the opening clause of the proposal, "We propose to furnish seventy-two Kohler magazine reels * * * for use

in the plant of Chicago Daily News at Chicago, Illinois," and a provision that "the apparatus covered by this proposal is built to meet the special requirements of the purchaser, is applicable for this installation only," indicate that the contract is not one of sale but of manufacture and installation. The reference "for use" is obviously a matter of description, designating the place where the plaintiff desired the machinery to be installed. Since the plant of Kohler Brothers was not located in Chicago the direction may well have been for shipping purposes, or it may have been for the purpose of confirming the right (to use the reels) which the plaintiff already had under the contract of July 15, 1907, between its predecessor and Kohler. A conveyance or sale of property for a designated purpose or use does not necessarily amount to an agreement by the purchaser precluding its use for any other purpose. (*Downen* v. *Rayburn*, 214 Ill. 342; *Supervisors of Warren County* v. *Patterson*, 56 id. 111.) The second quoted clause is merely explanatory of the language immediately following, to the effect that the contract is not subject to cancellation. There is not one word in the contract by which the plaintiff promised to refrain from using the reels elsewhere than in its plant or from re-selling them.

The defendant argues, however, that the last paragraph of the letter accompanying the proposal states a condition precedent to the allowance of $1250 on each reel, namely, the use of the reels on the presses in the plaintiff's plant. The plain language of the last paragraph of the letter of July 27, 1927, cannot be so distorted. It contains neither a condition precedent for the allowance of $1250 per reel nor a promise to use the reels, but is merely a recital purporting to state a reason for reducing the standard printed price appearing on the printed form of contract. The operative part of the agreement is clear and free from ambiguity. Mere recitals, whether they are found in a preamble or at the end of a contract, are distinguishable from

obligations or promises. The contract itself is one of bargain and sale, and its clearly expressed stipulations cannot be controlled by but must prevail over the recitals. (*Williams* v. *Barkley,* 165 N. Y. 48; *Hansbarger* v. *Hansbarger,* 206 Mich. 281; *Irwin's Bank* v. *Fletcher Savings and Trust Co.* 195 Ind. 669.) Moreover, courts are reluctant to enforce limitations and restrictions upon a purchaser's right to use property once sold him and require unequivocal language to create such restrictions. (*United States* v. *General Electric Co.* 272 U. S. 476; *Boston Store of Chicago* v. *American Graphophone Co.* 246 id. 8; *Dr. Miles Medical Co.* v. *Park & Sons Co.* 220 id. 373.) The defendant's argument reduces itself to the proposition that because the plaintiff bought patented articles from the patentee it did not obtain clear title to them owing to the fact that it had shop rights in the patented article. The allowance of $1250 per reel was granted because the plaintiff already had the right to use the reels rather than for a promise not to sell. Reference to the license agreement would have been unnecessary had the price been $4000, and a supposed reduction for a right which the plaintiff had long possessed would be unreasonable. When Kohler contracted, he could sell either the right to use, or title to, the patented reels. Manifestly, when he could, and did, sell only the latter to the plaintiff there was a plain reason for a reduction in price. Enjoying the right to make and use the reels, it is only natural that the plaintiff would pay less, and that Kohler would be more willing to make a concession from his standard price to it than to anyone who did not already have that right.

From the evidence adduced it appears that the plaintiff and Kohler construed the contract to mean that the price of each reel was $2750. The meaning of a written contract is ordinarily a question of law and not one of fact. If, however, the construction of the agreement is dependent not only upon the meaning of the words employed but also

upon extrinsic facts and circumstances or upon the construction which the parties themselves have placed upon the contract, and the facts are controverted, the inference to be drawn is for the jury. (*Turner* v. *Osgood Art Colortype Co.* 223 Ill. 629.) Again, where the terms of an agreement are in any respect ambiguous, and the parties have by their own acts placed a reasonable construction upon them, their interpretation will be adopted by the court. (*Burgess* v. *Badger,* 124 Ill. 288; *People* v. *Murphy,* 119 id. 159.) In *Slack* v. *Knox,* 213 Ill. 190, we said: "It is permissible in construing a contract to look to the interpretation that the parties thereto have placed thereon in its performance, for assistance in ascertaining its true meaning. 'No extrinsic aid can be more valuable.' "

To support its contention that the price of each reel was $2500, the plaintiff invokes the familiar rule that if the meaning of a contract is plain, the intention of the parties to it must be ascertained by the language employed in the contract itself and not by the interpretation placed upon it by the parties. (2 Williston on Contracts, sec. 623; *Rosenbaum Bros.* v. *Devine,* 271 Ill. 354; *Finch* v. *Theiss,* 267 id. 65.) The acts of the parties do not prove a construction contrary to the plain meaning of the contract. On the contrary, their interpretation of it before differences arose coincides with its express terms and fortifies the conclusion that the price intended to be fixed by the parties was $2750 per reel.

It is shown that subsequent to the execution of the contract the plaintiff purchased two additional reels priced at the same rate as the seventy-two reels specified in the proposal of July 27, 1927. It will be further observed that Kohler acknowledged the order for these two reels, stating: "We will bill them to you when delivered at the price stated." These reels were invoiced by Kohler and paid for by the plaintiff at the rate of $2750 each. The complete transaction relating to these two reels was conducted

without dispute, and is strong, if not conclusive, evidence of the price as construed by both parties. Further evidence of the plaintiff's interpretation of the price is found in a letter dated February 2, 1929, to a prospective purchaser of a portion of the reels. In this letter the plaintiff said: "We will sell to you fifteen Kohler reels at $2500 per reel (total $37,500) now in our possession, and if Mr. Kohler should sue you for the difference between the price per reel of $2750 which was paid by us, and the price of $4000 which Mr. Kohler claims we must pay if we re-sell, we will pay to you the amount of such difference," etc. This letter contains a construction made against interest, to the effect that the price of the reels was $2750. On another occasion, prior to the delivery of the remaining sixty-four reels, the plaintiff offered to sell them back to Kohler for $2500 each. Manifestly, the plaintiff was not offering to re-sell the reels to Kohler at $2500 if that was the contract price for all purposes. Indeed, the plaintiff's letter of May 16, 1928, recognized that Kohler might be entitled to compensation in addition to the retention of the reels.

The defendant next contends that Kohler was not in default because of his failure to deliver the sixty-four remaining reels on September 1, 1928, or before January 26, 1929. On the contrary, she asserts that the plaintiff's failure and refusal to make the payments due on October 1 and November 1, 1928, constituted a material breach of the contract, which excused Kohler from performance and barred the plaintiff from recovery. According to her argument the contract contemplated that shipment of the reels and the installation of the presses in the plaintiff's new building should be concurrent. To sustain this argument she has recourse to certain provisions of the original contract of July 27, 1927. The plaintiff, on the other hand, maintains that the time for delivery was not concurrent with the installation of the presses, and it relies upon the amendment of the original contract on November 22, 1927.

By Kohler's letter on the day named it was expressly provided that shipment of the sixty-four remaining reels was to be made September 1, 1928, and the terms of payment were modified so that the last two installments became due on the first days of October and November, 1928. The letter superseded the original agreement with respect to payment for and shipment of the reels. The rules applicable to concurrent conditions where performances were not originally due simultaneously are succinctly stated in the Re-statement of the Law of Contracts, sec. 273, as follows:

"(1) Where by the terms of promises for an agreed exchange some performance by one party is to be rendered before some performance of the other party and the former performance is delayed until the time fixed for the latter has arrived, then, if both performances can be rendered simultaneously and the parties assured that they are being so rendered, the duty to render the former performance with damages for the delay becomes concurrently conditional on performance of the latter, except as stated in sub-section 2.

"(2) Where such delay by a party in rendering a prior performance as is stated in sub-section 1 is material but not excused under the rules stated in secs. 294-306, topic 5, he becomes, at the option of the other party, subject to a duty to pay damages based on the difference in value of the respective performances instead of the duty stated in sub-section 1, and cannot by tender of performance acquire a right to return performance."

The evidence shows that after May 16, 1928, Kohler knew that the remaining reels could not and would not be used on the presses in the plaintiff's new building. Although there were futile negotiations for two-arm reels, the correspondence and the negotiations fail to indicate any acquiescence on the plaintiff's part to delayed delivery of the sixty-four three-arm reels. The further contention that the plaintiff failed to furnish specifications for the

reels cannot avail the defendant. The evidence shows that eight of the seventy-two reels were delivered in December, 1927, and accepted in conformity with the contract. Kohler must have had sufficient data prior thereto to enable him to make delivery of these reels. In his letter of May 16, 1928, referring to the sixty-four reels, Kohler stated, "We have ordered all these reels and the principal parts of all of them have now been manufactured." In early August, 1928, Kohler promised to make deliveries September 1, 1928, but made no complaint that he lacked specifications, and on the eighth day of that month he stated he would proceed and equip the reels the same as those delivered in December, 1927. Deliveries of reels were actually made between September 1 and December 3, 1928. If data and specifications were available for the reels delivered between the days named, surely they were not lacking for the remainder of the reels. It is also shown that the plaintiff made all payments due under the contract except those for October 1 and November 1, 1928. Prior to September 1 the plaintiff had paid Kohler $144,000 and had received only eight of the seventy-two reels. By the first day of October it had received only twelve of the sixty-four reels agreed to be delivered on the first day of the preceding month. Kohler made no mention of the last two installments prior to November 5, 1928. Indeed, after October 1 Kohler delivered eight reels in that month and ten more early in December, making thirty reels shipped on and after September 1. On the 24th of November Kohler wrote to the plaintiff seeking information whether it intended to make the payments due October and November 1, 1928. On December 7, 1928, the plaintiff replied: "We are prepared to make the last two payments as soon as your shipments are completed. If you wish, send the bills of lading with draft attached." The specified payments were conditional upon delivery, and no duty rested on the plaintiff to pay the last two installments irrespective

of delivery. Kohler was in default because he did not deliver the reels, and the plaintiff was not in default owing to non-payment of the installments due under the modified agreement on October 1 and November 1, 1928. These are mixed questions of law and fact, and the decision of the Appellate Court upon the contention of the defendant adversely to her is binding upon us.

Numerous specific charges of misconduct on the part of the plaintiff's counsel are made. In the course of his closing argument to the jury he designated one of the jurors as a draftsman. The particular juror was a draftsman, and it is urged that error was committed in addressing this juror individually and requesting him to resort to his technical knowledge in the examination of certain drawings admitted in evidence. No objection is shown to have been made at the time these remarks were made, hence no question of their propriety is preserved for review.

Complaint is also made that the argument by counsel for the plaintiff to the effect Kohler made a profit of $50,000 by not delivering the thirty-four remaining reels was prejudicial. The evidence shows that Kohler received $135,110 gross for these thirty-four reels, or $3973.82 each. Calculated at the price of $2500 each, the aggregate price would have been $85,000 and the resultant gross profit would have amounted to $50,110. On the basis of $2750 each the gross profit would have been $41,610. Under the defendant's plea of set-off, testimony as to what Kohler received through the sale of the reels was competent upon the amount of his damages, if any. However, the evidence fails to show that Kohler made a net profit of $50,000 through the sales to third parties. The changes he made through necessity and the selling cost amounted to $30,000. To the extent that the evidence discussed related to the set-off, and the question whether Kohler breached the contract with the plaintiff in good faith or owing to the prospect of additional profit accruing from the sale of the reels

to others, the remarks were within the legitimate scope of argument.

In his closing argument counsel for the plaintiff commented on the fact that Franklin W. Kohler, a son of G. A. E. Kohler, was not called by the defendant to testify. Section 2 of the Evidence act (Cahill's Stat. 1933, p. 1403; Smith's Stat. 1933, p. 1452;) provides, among other things, that no party to a civil suit or proceeding, or person directly interested in the event thereof, shall be allowed to testify therein of his own motion or in his own behalf when any adverse party sues or defends as an executor, administrator, heir or legatee of a deceased person. This provision applies to witnesses directly interested in the outcome of the litigation although not parties thereto. The disqualifying interest must be a certain and immediate interest in the operation and effect of the judgment or in the record as legal evidence against him in some other action, otherwise the interest of the witness goes to his credibility and not to his competency. (*Stephens* v. *Hoffman,* 263 Ill. 197; *Ackman* v. *Potter,* 239 id. 578; *Feitl* v. *Chicago City Railway Co.* 211 id. 279.) The facts here show that Franklin W. Kohler, the son of G. A. E. Kohler and the administratrix of his estate, has a direct and pecuniary interest in the outcome of this suit. The result of this litigation will be to either enrich or diminish the estate of his father. However, the plaintiff did not sue as an executor, administrator, heir or legatee of a deceased person, and the interest of the administratrix is not adverse to that of Frank W. Kohler. Section 2 of the statute above referred to is intended, among other ends, to protect a party suing or defending as an heir, legatee or devisee. (*Brownlie* v. *Brownlie,* 351 Ill. 72, 77.) As we have pointed out, that situation is not presented here since the plaintiff did not sue in such capacity. Franklin W. Kohler was a competent witness and his interest in the outcome of the suit only affected his credibility. Counsel's reference to the fact that

he did not testify was therefore within the proper scope of argument in a civil case.

Errors in giving and refusing instructions are also charged. . Instructions 3 and 13 given on behalf of the plaintiff advised the jury, among other things, that the contract price of the seventy-two reels was $180,000, or $2500 each. To the extent that they thus fixed the price both instructions were erroneous. The contract price was $180,000, or $2500 per reel, only if the two allowances mentioned in the letter of July 27, 1927, were made. Of these, one was unconditional and the other qualified. Specifically, the contract price was $2500 each only in the event that the fifteen old reels in use at the plaintiff's plant on the day the original contract was executed should be returned to Kohler. This was never done. Of the fifteen old reels eleven were sold by the plaintiff for junk and the other four remained in its possession. Proof is wanting that Kohler assented to this disposition of a portion of them contrary to the express terms of the contract. The defendant also attacks the remaining eleven instructions given in the plaintiff's behalf, predicated upon its theory of the case. They set forth the legal principles applicable to the plaintiff's position and are substantially correct. The trial court also gave eleven instructions for defendant setting forth her theory of the case and adequately covering the issues. The contention that the refusal to give fourteen additional instructions was error is without merit.

For the errors indicated, the judgments of the Appellate Court and the circuit court of Cook county are reversed and the cause is remanded to the circuit court for a new trial.

*Reversed and remanded.*