CONWAY CORPORATION, Plaintiff,

v.

Carl H. AHLEMEYER, Sash A. Spencer and Charles I. Merrick, Defendants.

No. 89 C 8727.

United States District Court,
N.D. Illinois, E.D.

Nov. 16, 1990.

John J. Verscaj, Bell, Boyd & Lloyd, Chicago, Ill., for plaintiff.

Robert J. Kriss, Kurt D. Williams, Mayer, Brown & Platt, Chicago, Ill., for defendants.

MEMORANDUM OPINION
AND ORDER

SHADUR, District Judge.

Conway Corporation ("Conway") has sued Carl Ahlemeyer ("Ahlemeyer"), Sash

Spencer ("Spencer") and Charles Merrick ("Merrick"), all the shareholders (collectively "Shareholders") of Illinois Pork Corporation ("IPC"), for recovery of a commission that Shareholders assertedly owe under an October 31, 1988 letter agreement ("Agreement") as to the then-contemplated sale of Shareholders' IPC shares or of IPC's assets. Conway now seeks summary judgment against all three Shareholders under Fed.R.Civ.P. ("Rule") 56.[1] For the reasons set forth in this memorandum opinion and order, Conway's motion is granted in its entirety.

### Facts

IPC was a pork slaughtering and processing business in Monmouth, Illinois formed as the result of a joint effort by Shareholders, the City of Monmouth and the State of Illinois to reopen the former Wilson Foods Plant that had been vacant for almost one year—thus bringing some 500 jobs to economically-depressed Monmouth. IPC's shares were evenly divided among Ahlemeyer, Spencer and Merrick, and Merrick served as IPC's President and chief executive officer.

IPC began slaughtering operations in March 1987 and was operating profitably by 1988. At that time Ahlemeyer expressed an interest in selling his IPC shares, and Merrick and Spencer, although not wanting to terminate their investment in IPC, considered selling a portion of their shares as well. Ahlemeyer spoke with Bernard Conway ("Mr. Conway"), the principal in Conway (a Chicago business broker), about helping Shareholders in the sale of some or all of their shares. Mr. Conway told Merrick that Mariah Purina Company ("Purina") might be interested in purchasing IPC shares.

In September 1988 Mr. Conway drafted a proposed letter agreement covering his retainer as Shareholders' business broker. After Shareholders had provided their own input via proposed revisions,[2] Mr. Conway put the document in final form and Shareholders signed it in early November. These provisions of the Agreement are relevant to the present controversy:

> The purpose of this letter is to set forth the terms and conditions under which Conway Corporation agrees to serve all of the shareholders of Illinois Pork Corp. in the effort to sell all or some of their Illinois Pork Corp. shares to Mariah Purina Company. For purposes of this Agreement any other type of transaction between the shareholders and/or Illinois Pork Corp. and Mariah Purina Company, as for example a joint venture, sale of assets, merger, or co-investment with Mariah Purina Company in other projects, are specifically included. Excluded however are product sales by Illinois Pork Corp. to Mariah Purina Company in the normal course of business. It is agreed that Conway Corporation shall be the sole and exclusive independent contractor serving the Illinois Pork Corp. shareholders and/or Illinois Pork Corp. for effecting a transaction (as defined above) with Mariah Purina Company.
>
>     *    *    *    *    *    *
>
> 3. **FEES.** In the event of any transaction during the Term of this Agreement,

---

1. Rule 56 imposes on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called upon to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovants—in this case Shareholders (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 329 (7th Cir. 1987)). This opinion will refer to the parties' respective factual-statement submissions in support of and in opposition to Conway's motion, as called for by this District Court's General Rules 12(m) and 12(n), as "P. 12(m)" and "D. 12(n)."

2. Merrick says in his affidavit (D. 12(n) Ex. 1 ¶ 13) that he told Conway he wanted a stock sale and not an asset sale. But when Conway included language that would also bring an asset sale within the scope of the Agreement (and therefore make it commissionable), Merrick *accepted* that language (*id.*), as did the other Shareholders (*id.* Ex. 2 ¶ 8 and Ex. 3 ¶ 8). Merrick now tries to explain *why* he accepted (*id.* Ex. 1 ¶ 13)—a conveniently self-serving explanation—but his claimed motives are simply inadmissible to undermine the unambiguous provisions of the integrated document.

the shareholders of Illinois Pork Corp. agree to pay Conway Corporation at closing:

Fee based upon the total consideration (including, but not limited to, such considerations as payments in cash, stock, or kind; options; fees; debentures or convertible debentures; notes or other evidence of indebtedness; leases; as well as the total amount of earn out or covenants not to compete) received by Illinois Pork Corporation, its shareholders and affiliates, directly or indirectly arising from or connected to the transaction equal to: five percent (5%) of the first million dollars, four percent (4%) of the second million dollars, three percent (3%) of the third million dollars, two percent (2%) of the fourth million and one percent (1%) of the remaining consideration.

\* \* \* \* \* \*

**9. RIGHT OF REFUSAL.** Each shareholder shall have the sole and exclusive right to refuse any offer for his individual shares.

**10. ENTIRE AGREEMENT.** This is the entire agreement between the parties pertaining to its subject matter and supersedes all prior agreements, representations and understandings of the parties. No modification of this Agreement shall be binding unless agreed to in writing by the parties.

In January 1989 [3] the fresh pork industry experienced a sudden downturn, with the price of hogs increasing and the price of fresh pork decreasing. IPC's financial condition began to deteriorate. Although negotiations with Purina for its purchase of IPC's shares ceased in March, in May Purina expressed its interest in buying IPC's assets. At the end of June IPC's primary bank refused to renew its working capital loan. After the negotiations with a poten-

tial buyer of the shares (other than Purina) had fallen through, Purina issued a letter of intent to purchase IPC's assets. Merrick then issued a press release announcing Purina's offer and stating that IPC would cease operations in order to close the transaction and prepare for the transition.

In July Shareholders consented to an assignment of IPC to Development Specialists, Inc. ("DSI") for the benefit of the creditors. William Brandt, Jr. ("Brandt"), in turn the assignee from DSI, apparently agreed—with no objection from the secured creditors—that Conway's commission would be treated as an administrative expense. Then on September 11 an involuntary petition for bankruptcy was filed against IPC. Purina told Brandt that it would not close on the asset-sale transaction if IPC did not consent to the bankruptcy filing. On September 18 IPC consented to the filing. Richard Barber was appointed its trustee in bankruptcy ("Trustee").

Trustee promptly entered into an agreement with Purina for the sale of IPC's assets to Purina. On September 28 Conway filed an objection to the sale [4] in the bankruptcy court but that court overruled the objection, and the sale of IPC's assets to Purina closed on October 3, with the proceeds of sale being paid to the estate of IPC. All the proceeds have been distributed to secured creditors by order of the bankruptcy court, except for that court's retention in escrow of an amount sufficient to cover Conway's claim for commission due from the sale. [5]

Conway then filed its Complaint here, praying for a judgment:

a) declaring the rights and obligations of the parties to the contract and, specifically, that defendants, Ahlemeyer, Spencer and Merrick are individually and person-

---

**3.** Unless otherwise noted, all events referred to after this point occurred in the year 1989.

**4.** Objection of Party in Interest to Sale of Assets, *In re Illinois Pork Corp.,* No. 89–71988 (Bankr.C. D.Ill.). Conway says here that it objected to the sale because even though the Asset Purchase Agreement provided for the payment of Conway's fees as a part of the closing costs, no such payment had been arranged by Trustee.

**5.** Conway has also made a claim for its fee in the bankruptcy court. Trustee and the most junior secured creditors objected to the claim. On August 30, 1990 Bankruptcy Judge William Altenberger denied cross-motions for summary judgment (*In re Illinois Pork Corp.,* No. 89–8296 (Bankr.C.D.Ill.)), and no new hearing date has been set pending the outcome of this action.

ally obligated to pay plaintiff Conway Corporation its fee pursuant to the contract;

b) in favor of plaintiff Conway Corporation and against defendants, Ahlemeyer, Spencer and Merrick jointly and severally in the amount of $234,500; and

c) awarding plaintiff Conway Corporation its costs of suit, reasonable attorneys' fees and such other and further relief as the Court deems just and equitable.

This opinion will discuss the issues of liability and damages separately.

### Rights and Obligations Under the Agreement

■ This is a straightforward contract action. Under the Illinois law controlling this case,[6] " 'the meaning of a written contract is ordinarily a question of law and not one of fact' " (*Hufford v. Balk*, 113 Ill.2d 168, 172, 100 Ill.Dec. 564, 566, 497 N.E.2d 742, 744 (1986), quoting *Chicago Daily News, Inc. v. Kohler*, 360 Ill. 351, 363, 196 N.E. 445, 451 (1935)). This Court's "primary objective in construing a contract is to ascertain the intent of the parties and to give effect to that intent" (*United Airlines, Inc. v. City of Chicago*, 116 Ill.2d 311, 318, 107 Ill.Dec. 705, 708, 507 N.E.2d 858, 861 (1987)). *LaSalle National Bank v. Service Merchandise Co.*, 827 F.2d 74, 78 (7th Cir.1987) (citations omitted) has set out the basic principles of Illinois law as to the construction of contracts:

The starting point must be the contract itself. If the language of the contract

unambiguously provides an answer to the question at hand, the inquiry is over. The question of whether a contract is ambiguous is a conclusion of law.... If the trial court determines that the contract is unambiguous, it must then go on to declare its meaning. Such a declaration is also a conclusion of law....

Thus this opinion must first address whether or not the Agreement is ambiguous (*Samuels v. Wilder*, 871 F.2d 1346, 1351 (7th Cir.1989)). *Thompson v. Amoco Oil Co.*, 903 F.2d 1118, 1120 (7th Cir.1990) quotes the straightforward definition of that concept in *UIDC Management, Inc. v. Sears Roebuck & Co.*, 141 Ill.App.3d 227, 230, 95 Ill.Dec. 691, 693, 490 N.E.2d 164, 166 (1st Dist.1986):

A contract is ambiguous when its terms are reasonably capable of interpretation in more than one way.

Although Shareholders make several stabs at an argument that the terms of the Agreement are somehow ambiguous, the ensuing discussion demonstrates the transparency of those attempts to avoid the plain meaning of the Agreement.

Shareholders contend that the Agreement contains both intrinsic and extrinsic ambiguities. *FDIC v. W.R. Grace & Co.*, 877 F.2d 614, 620 (7th Cir.1989) (citations omitted) has described those two forms of ambiguity under Illinois law:

One is internal ("intrinsic"), and is present when the agreement itself is unclear. The other is external ("extrinsic") and is present when, although the agree-

---

**6.** Because federal jurisdiction sounds in diversity of citizenship, this Court must look to Illinois law—including its choice of law doctrine—for the applicable rules of decision. (see *Autocephalous Greek–Orthodox Church of Cyprus v. Goldberg and Feldman Fine Arts, Inc.*, 917 F.2d 278, 286 (7th Cir.1990)). *Purcell & Wardrope Chtd. v. Hertz Corp.*, 175 Ill.App.3d 1069, 1079, 125 Ill.Dec. 585, 592, 530 N.E.2d 994, 1001 (1st Dist.1988) teaches that Illinois courts use the "most significant relationship" test for contract disputes:

The factors to be considered in determining which state has the most significant relationship to a contract claim are: the place of negotiation, the place of execution or contracting, the place of performance, the location of the subject matter of the contract, and

the domicile, residence, place of incorporation, and the business of the parties. Conway is an Illinois corporation and maintains its principal place of business in Chicago. Although the citizenship of all the Shareholders is other than Illinois (New Jersey as to Ahlemeyer, Florida as to Spencer and Oklahoma as to Merrick), their involvement in this action stems from their holdings of shares in IPC, an Illinois corporation with its principal place of business in Monmouth, Illinois. Shareholders conducted their business meetings in Illinois. Correspondence from Conway (including the Agreement) was addressed to IPC or Shareholders in Illinois. All indications thus lead to Illinois, and indeed both sides acknowledge the application of Illinois law to this contract dispute.

ment itself is a perfectly lucid and apparently complete specimen of English prose, anyone familiar with the real-world context of the agreement would wonder what it meant with reference to the particular question that has arisen. So parol and other extrinsic evidence is admissible, even in a case involving a contract with an integration clause, to demonstrate that the contract is ambiguous.

Accord, *Toys "R" Us, Inc. v. NBD Trust Co. of Illinois,* 904 F.2d 1172, 1176 (7th Cir.1990).

As for intrinsic ambiguities, Shareholders first argue that the Agreement's statement that "Conway Corporation agrees to serve all of the shareholders of Illinois Pork Corp." is ambiguous because Conway ultimately served the Trustee and not Shareholders. Of course, that is not really an argument that the Agreement's language is ambiguous—instead it urges that Conway did not perform its obligations (which are unambiguous in at least that respect, even in Shareholders' eyes) because it did not indeed "serve" Shareholders. Hence the argument does not properly fit at this point.[7]

Second, Shareholders contend that "IPC" is an ambiguous term because it is unclear whether it was intended to mean "the bankrupt estate of IPC." Again that does not render the language of the Agreement itself ambiguous. It rather begs the question whether the Agreement was per-

formed according to its explicit terms, an issue discussed later in this opinion.[8]

In sum, Shareholders have produced no colorable basis for suggesting that the terms of the Agreement are patently ("intrinsically") ambiguous. This opinion turns then to extrinsic ambiguity.

On that score *W.R. Grace,* 877 F.2d at 621 (citations omitted) teaches that extrinsic evidence is admissible to demonstrate the existence of such an ambiguity:

> even if the contract has no intrinsic ambiguity—even if it would seem perfectly clear to a normal reader of English, although to persons knowledgeable about the circumstances in which the contract had been intended to apply the "normal" reading might be nonsense.

But that is not at all the line of attack that Shareholders follow. Instead they try to avoid the plain and obvious meaning of the Agreement's terms with extrinsic evidence.

■ That evidence is two-fold in nature:

1. Shareholders produce affidavits to show that they never intended to be personally responsible for payment of commission upon a sale of assets.

2. They also claim that the Agreement's "RIGHT OF REFUSAL" provision was meant to ensure that Shareholders had complete control over any sale, from which they conclude that Trustee's sale of the assets was not part of the Agreement's coverage.

---

7. Nor will it be addressed later, because Shareholders plainly take the statement out of context and distort its meaning. In its entirety the sentence reads:

> The purpose of this letter is to set forth the terms and conditions under which Conway Corporation agrees to serve all of the shareholders of Illinois Pork Corp. in the effort to sell all or some of their Illinois Pork Corp. shares to Mariah Purina Company.

To the extent (if at all) that the sentence may be viewed as having any limiting substantive content, it simply stands for the proposition that Conway was simultaneously bound to serve the interests of *all* Shareholders, not just one or two, in the effort to sell their shares. In any event, because this action concerns a sale of assets and not shares, no such concern is implicated. Indeed, that same paragraph later in-

cludes the relevant statement (emphasis added) applicable to a sale of assets:

> It is agreed that Conway Corporation shall be the sole and exclusive independent contractor *serving* the Illinois Pork Corp. shareholders and/or *Illinois Pork Corp.* for effecting a transaction (as defined above) with Mariah Purina Company.

And as this opinion discusses later, the distinction between IPC and the "estate" of IPC (for which Trustee was simply a representative) does not affect Conway's claim.

8. Shareholders put forth what they deem a third intrinsic ambiguity, but it is simply another version of the same theme—that the contract terms are ambiguous because the end result was not what Shareholders now say they thought that the terms contemplated. Again that is not an argument for intrinsic ambiguity.

Once again those are not arguments for ambiguity, but rather fly in the face of the express terms of the Agreement—terms that provide (as to the first contention) for *Shareholders'* unequivocal obligation to pay the commission [9] and provide (as to the second contention) for Shareholders' right to refuse to sell only their *shares.* [10]

Even if Shareholders' arguments are given more credit than they are due, they are at most disagreements on the meanings of the Agreement's provisions (and post hoc disagreements at that). But contract terms are "not rendered ambiguous simply because the parties do not agree on [their] meaning" (*Johnstowne Centre Partnership v. Chin,* 99 Ill.2d 284, 288, 76 Ill.Dec. 80, 81, 458 N.E.2d 480, 481 (1983) (citation omitted)).

Because no ambiguity of either type—intrinsic or extrinsic—exists, "the intention of the parties at the time the contract was entered into must be ascertained by the language utilized in the contract itself, not by the construction placed upon it by the parties" (*Lenzi v. Morkin,* 103 Ill.2d 290, 293, 82 Ill.Dec. 644, 645, 469 N.E.2d 178, 179 (1984), citing *Chicago Daily News,* 360

Ill. at 364, 196 N.E. at 451). Conway argues that the intention of the parties is plain and obvious under the express language of the Agreement:

1. At the outset the Agreement specifically identified a sale of IPC's assets to Purina as a "transaction" within its scope.

2. Agreement ¶ 3 (emphasis added) specified:

In the event of any transaction during the Term of this Agreement the *shareholders* of Illinois Pork Corp. agree to pay Conway at closing [a] "[f]ee based upon the total consideration ... received by *Illinois Pork Corp.,* its shareholders and affiliates."

Shareholders cannot and do not rationally dispute the *meaning* of those terms, which are clear on their face. Although Shareholders would like to bring in extrinsic evidence to show that they understood the terms to mean something other than what the language clearly conveys,[11] such use of parol evidence is disallowed absent any ambiguity (*Calder v. Camp Grove State Bank,* 892 F.2d 629, 632 (7th Cir.1990)).[12]

**9.** Indeed, *only* Shareholders signed the Agreement. IPC itself did not. In a variant on their no-intention-to-pay argument, Shareholders say (accurately enough) that the parties never discussed the contingency of IPC's bankruptcy followed by a sale of assets. But the absence of discussion of a particular situation to which a party's contractual undertaking applies in unequivocal terms cannot justify a court's refusal to enforce that undertaking.

**10.** That provision is all of a piece with the initial discussions among Shareholders in which Ahlemeyer wanted out entirely, while Spencer and Merrick were less certain. But to the extent that the Agreement also contemplated other forms of transaction at the corporate rather than the individual level (as it expressly did in speaking of sale of assets or merger or "co-investment with [Purina] in other projects"), by definition the "right of refusal" of any Shareholder would be a function of corporate law (as perhaps modified by any preexisting shareholders' agreement)—calling for a two-thirds majority on the first two types of deal, and effectively on the third as well (given the parties' equal shareholdings). Hence the "RIGHT OF REFUSAL" provision does not on its own have the thrust that Shareholders seek to ascribe to it.

**11.** Two of the three Shareholders try to invoke custom and usage for the proposition that com-

missions are conventionally paid by the seller who receives the consideration or the buyer who receives the goods (D. 12(n) Ex. 1 ¶ 7, Ex. 3 ¶¶ 6–7). But even if that *does* represent the usual brokerage arrangement, of course nothing prevents parties from expressly contracting differently. After all, the appropriate role of custom and usage in contract jurisprudence is to fill in gaps left by the parties' contract terms or to explain the terms' meaning (as described in the already-completed ambiguity analysis), *not* to override specific terms in the contract.

**12.** By sheer chance this Court had occasion only last week to deal at length with the same principles of contract construction that are explored here (*Board of Trustees of the University of Illinois v. Insurance Corp. of Ireland,* 750 F.Supp. 1375, 1379–81 (N.D.Ill.)). That opinion emphasized the critical need for *communicated* intent in applying the objective principles of contract law (*id.* at 1380 n. 12, 1382), though the case itself presented the really unique situation of a mutual intention that was established unequivocally and was therefore held binding on the parties even though uncommunicated (*id.* at 1384–85). But *this* case presents the impermissible effort by *one* of the contracting parties to escape the clear meaning of the language used, by means of professing a different under-

Shareholders do dispute, however, whether the Agreement has been performed in accordance with its terms (D.Mem. 9–10, footnote omitted):

> Conway was unsuccessful in its attempts to sell defendants' stock. Conway was also unsuccessful in selling the assets of IPC in a transaction approved by the shareholders in which IPC or the shareholders received the sales proceeds. Instead, the evidence shows that Conway may have assisted a bankruptcy trustee in selling the assets of IPC's bankrupt estate, a separate legal entity from IPC, in a sale over which defendants had no control and in which the secured creditors of IPC, not IPC or its shareholders, received the sales proceeds.

That argument is replete with fallacies.

First, it is immaterial under the express terms of the Agreement just which type of "transaction" occurred, whether a sale of shares or a sale of assets or some other form of deal included in the Agreement's scope. Hence the lack of success in negotiating a sale of shares, regardless of how much Shareholders may have preferred such a sale, is irrelevant to Conway's claim.

Second, Shareholders' argument that the payment of commission was contingent upon their approval of the transaction and their control of the sale is similarly flawed. As already pointed out (see n. 10), the Agreement merely provided that any one of Shareholders could refuse an offer for his *shares*, and it mentions nothing about who must be in control of the sale if the transaction took some other form.

Third, Shareholders make much of the facts that it was the Trustee (and not IPC or Shareholders) who made the sale and that the sale was of the assets of the bankrupt estate of IPC (and not of IPC itself). But Shareholders cannot avoid their obligation under the Agreement based upon a claimed distinction between IPC before and after bankruptcy. Under the Bankruptcy Code (11 U.S.C. § 541(a)(1)), property of the bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case" (see also *Koch Refining v. Farmers Union Central Exchange, Inc.*, 831 F.2d 1339, 1343 (7th Cir. 1987)). Trustee stood as IPC's surrogate, serving as the representative of the estate's and creditors' interests in all property of the estate (see *id.* at 1342–43, 1352). In law the sale of IPC's assets by Trustee indisputably inured to IPC's benefit—it *was* a "transaction" between IPC and Purina within the meaning of the Agreement. That being so, Shareholders had the express and unqualified obligation of payment that they undertook individually under the "FEES" provision of the Agreement.[13]

Furthermore, the fact that Trustee may have reviewed the discussions with Purina and thus instigated the ultimate sale does not change the terms of the Agreement, which did not limit commissionable transactions to those directly negotiated by Conway.[14] As long as the estate received the proceeds of the sale, the consideration was effectively received in the sense of the Agreement,[15] and Conway's commission was therefore due and payable.

standing (see Learned Hand's classic "twenty bishops" statement in *Hotchkiss v. National City Bank of New York*, 200 F. 287, 293 (S.D.N.Y. 1911), *aff'd*, 201 F. 664 (2d Cir.1912), *aff'd*, 231 U.S. 50, 34 S.Ct. 20, 58 L.Ed. 115 (1913)).

**13.** Although not necessary to the result here, it is worth noting that despite IPC's bankruptcy and despite the consequent distribution of the sale proceeds to its creditors and not to Shareholders, Conway has shown without contradiction that Shareholders derived a major economic benefit from the transaction—they were released from $900,000 worth of their own personal guaranties (P. 12(m) Ex. C ¶ 3).

**14.** It is not at all unusual for brokerage agreements to extend the "procuring cause" concept to any prospect who was produced by the broker even if the negotiations leading to sale do not involve the broker, nor is it unusual in exclusive-agency arrangements for the broker to receive a commission even where the buyer is procured entirely by someone else—or even by the seller directly.

**15.** Agreement ¶ 3 as to "FEES" defines the amount of the fee as "based upon the total consideration ... received by Illinois Pork Corp., its shareholders and affiliates." Plainly the use of the connector "and" in that provision did *not* mean that consideration had to be re-

Although Shareholders may no doubt have hoped or even expected to pay the commission from the proceeds of the sale and may well feel that would be the fairer result, no such limitation was reflected in the terms of the Agreement itself.[16] Conway performed fully, and Shareholders are obligated under their express and unambiguous contract to pay the commission.

### Amount of Damages

■ Shareholders purport to dispute the amount of total consideration received from the sale and thus the amount of commission due according to the contractual formula. As it turns out, however, that dispute (to the limited extent that it is properly presented in admissible form) is not material (that is, it is not outcome-determinative).

Mr. Conway verifies by his affidavit (P. 12(m) Ex. C ¶¶ 3–4) that the total consideration for the sale was $13.45 million, comprising $8.25 million in cash, $900,000 in release of personal guaranties that had been given by Shareholders and $4.3 million in other consideration (including lease assumptions, supplies, net operating losses and liability relief). Based upon the contractually stipulated formula, the commission due from such a sale was $234,500. Conway also asserts (*id.* ¶ 5):

> Merrick told me that, based upon his conversations with Ahlemeyer and Spencer, the fee of $234,500 was correct and agreeable to them.

On their part Shareholders offer a July 3, 1989 letter invoice from Mr. Conway to Merrick (D. 12(n) Ex. 7) describing the total amount of consideration received as $15.90 million [17] and therefore claiming a fee of $259,000. Shareholders also advance the wholly conclusory assertion that Conway's calculations, above and beyond the $8.25 million in cash received by IPC, have no basis in fact, and they further offer Merrick's affidavit statement that he never agreed with Mr. Conway's figures (D. 12(n) Ex. 1 ¶ 36).

That last statement—Merrick's lack of agreement with Mr. Conway's figures— must be credited on the current motion. But what controls this case is what the total consideration was *in fact*, not whether the parties reached common ground on the figures. Thus the existence of that factual dispute (the non-agreement as to amount) is not material in the sense of Rule 56(e).

■ As for the real question, the amount of commission involved, Shareholders cannot combat something (Mr. Conway's verification) with nothing (their bare denial)—see Rule 56(e).[18] And Shareholders themselves have presented (D. 12(n) Ex. 6) the August 30, 1990 decision by Bankruptcy Judge Altenberger (see n. 5) in which he expressly finds "The total sale proceeds were $13,450,000.00"—the identical figure verified by Mr. Conway. Although Judge Altenberger denied summary judgment in the case before him because

---

ceived by *each* of IPC, Shareholders and affiliates before commission was due. "And" was simply meant in the sense that Conway properly wanted to *add up* the consideration that might be received by each of them individually as a result of the sale. For example, where as here Shareholders were indeed released of personal guaranties as a result of the sale, the value of that consideration goes into the calculation of total consideration.

16. Of course the possibility is not foreclosed that Shareholders can pursue whatever claims they may have for indemnification from IPC's bankruptcy estate. That is not the business of this Court, which is simply called upon to determine liability under the Agreement.

17. That total was said to stem from these items (*id.*):

| | |
|---|---|
| Asset purchase price | $8.25M |
| Personal guarantees release | $ .90M |
| Wilson debt release (.85 of $2M) | $1.70M |
| State debt release (.85 of $3M) | $2.55M |
| Lease assumptions | $2.50M |

18. Conway's unverified July 3, 1989 invoice in which he asserted a larger amount based on information that he then had (it will be recalled that he was not himself involved in the closing) does not create a factual issue such as to preclude summary judgment for the lesser amount he now swears to. It would of course be different if the numbers were reversed, in which event the earlier invoice asserting a lower number would constitute an admission under Fed.R. Evid. 801(d)(2)(A), thus creating a material factual issue as to the collectibility of a higher amount.

there were genuine issues of material fact requiring resolution, he specifically identified what those open factual questions were, and the disputed factual issues did *not* include the amount of sale proceeds or the derivative amount of the commission, $234,500 (*both* those items were expressed as Findings of Fact by Judge Altenberger).[19]

In summary, Conway has met its obligation to establish the amount as well as the fact of its entitlement to commission. Shareholders have not succeeded in their effort to muddy the waters with their claimed factual disputes.

### Conclusion

There is no genuine issue of material fact, and Conway is entitled to a judgment as a matter of law. This Court therefore orders that judgment be entered in favor of Conway and against all three Shareholders jointly and severally in the sum of $234,-500.

---

**19.** It may also be viewed as relevant (although it is not of course dispositive) that both Merrick and Spencer filed Proofs of Claim in IPC's bankruptcy case (D. 12(m) Ex. H), asserting priority claims in the selfsame amount of $234,500 as "commission allegedly incurred in the sale of Debtor's assets...."