Lindberg Machine Works, Appellee, v. Bernhard Lindberg, Appellant.

Gen. No. 40,670.

544

Heard in the second division of this court for the first district at the April term, 1939.

Opinion filed May 28, 1940.

LEWIS BENNETT, NATHAN BENNETT and B. M. STEINER, all of Chicago, for appellant; NATHAN BENNETT and B. M. STEINER, of counsel.

HARRY A. BIOSSAT, of Chicago, for appellee.

MR. JUSTICE FRIEND delivered the opinion of the court.

Lindberg Machine Works, a corporation, filed a complaint in equity against Bernhard Lindberg and Harry Koplin, defendants, seeking specific performance of an alleged oral agreement between the incorporators of plaintiff company and Lindberg, whereby it is alleged that the latter was to assign two certain patents to the corporation. The complaint sought to have the court determine that plaintiff is the owner of these patents, that Lindberg be compelled to assign them to plaintiff, that an injunction issue restraining him from assigning

the patents during the pendency of the suit, and for other relief. Lindberg's answer denied that plaintiff was entitled to any of the relief prayed for, and interposed a counterclaim for salary aggregating some $3,-000. Koplin's motion to strike the complaint was sustained by the court, and he was dismissed from the suit without prejudice and without costs. The master to whom the cause was referred found the equities in favor of plaintiff and recommended the entry of a decree granting the relief prayed and dismissing Lindberg's counterclaim, except as to the sum of $368.85, which plaintiff admitted to be due Lindberg. The court entered a decree in accordance with the master's recommendations and Lindberg has taken an appeal.

Subsequent to the entry of the decree plaintiff had leave to file an amended and supplemental complaint, which recited the salient findings in the decree, that the court had reserved jurisdiction with reference to an accounting relating to the letters patent, and alleged that Koplin had full knowledge of the pendency of the suit and had dealt with Lindberg after acquiring full knowledge of plaintiff's rights to the patents; that any consideration for a conveyance paid to Lindberg by Koplin was made with full knowledge on Koplin's part of plaintiff's rights; and plaintiff prayed that as between it and Lindberg or any other defendants the former should be adjudged to be the owner of the patents in question; that Koplin be required to assign or convey the said patents and all his interest therein upon such conditions as the court might determine; that if Koplin had made any subsequent conveyances or assignments of the patents that the court should hold them to have been made in fraud of plaintiff's rights; and that Lindberg and Koplin be held accountable to plaintiff for any money or other property that they or either of them may have received with reference to the patent, and for a general accounting and such other relief as the court might deem fit to decree.

From a voluminous record which contains much conflicting testimony it appears that Lindberg had been in the laundry machine business for about 36 years and during that time had secured approximately 8 or 9 patents on various devices. Shortly prior to 1931 he had been associated with the Whelco Company, for which he had created and to which he had assigned certain inventions which were patented. Subsequently this concern went through bankruptcy and by reason thereof Lindberg had lost the benefits of his inventions.

The master found that early in February, 1931, Lindberg and Herbert T. Seger, who had also been associated with the Whelco Company, had a conversation wherein he "told the said Herbert T. Seger he had an idea for making a new cylinder door for wash machine, but that he needed assistance," and they decided to re-engage in the laundry machine business and to organize the plaintiff corporation. The incorporation of this concern was effected March 4, 1931. All the capital stock was paid in cash and no patents were included in the application for incorporation. There is a conflict in the evidence as to the amount of capital invested by Seger. He claims to have contributed $2,000, but Lindberg testified that Seger subscribed for only $1,500. However, the undisputed evidence discloses that Lindberg subscribed for $3,000 worth of stock in the new corporation, and thereafter paid in an additional $3,000, which he borrowed. After the company was organized, Lindberg acted as president until he severed his connection with the company April 4, 1936. In addition to his formal duties as president, he had general charge of the business, serviced accounts, made sales, collected money, and, as he testified, "did anything necessary to keep the company alive."

As said heretofore, Lindberg was an inventor and had had numerous inventions patented over a period of years. On the other hand, Seger admitted that he at no time created or invented any article or device, and

his sole connection with the patents involved in the case at bar was to make drawings in accordance with Lindberg's instructions. The application for the original patent, being 1,913,764, was filed February 24, 1931, before the corporation was organized. The application for patent No. 1,987,513, which is an improvement on the original patent, was filed July 11, 1933, and the patent issued July 8, 1935. Both applications were filed by Lindberg and both patents were issued to him.

Plaintiff contends that at the time Lindberg and Seger decided to organize the Lindberg Machine Works in 1931, Lindberg promised orally to assign both patents to plaintiff when issued, and the gist of these proceedings is for specific performance of the alleged verbal agreement. Manifestly, the agreement to assign the second patent could not have been made in 1931, as claimed, because the second patent was an improvement upon the original and was created and developed only after the original device was manufactured, used and found wanting or deficient in some particular. The application for the second patent was not made until July, 1933, which was more than two years after the alleged oral agreement was supposed to have been made, and it is extremely improbable that Lindberg could have contemplated an improvement on his original idea as early as 1931, especially since his application for the original patent was not filed until February 24, 1931. Plaintiff's bill was filed in September, 1936, more than five months after Lindberg severed his connections with plaintiff, and more than 5½ years after the alleged oral agreement was supposed to have been made.

As a basis for his conclusions and recommendations the master found "that it had been contemplated between the parties, that the said Bernhard Lindberg would assign the aforementioned patents to the plaintiff company." He did not find or specify any date upon which the alleged oral agreement was made, nor when the patents were to be assigned to the plaintiff cor-

poration. The evidence upon which this conclusion is predicated is conflicting. Herbert T. Seger, Mildred Seger-Nyberg, Andrew Johnson and Mrs. A. T. Seger, testified to various conversations purporting to show that Lindberg had agreed to assign these patents to the corporation, but their testimony is rather vague, and all the witnesses were of course interested in the successful outcome of the suit. Lindberg, on the other hand, positively denied that any such agreement had been made. Evert Wengstrom and his brother, Ellis, who testified on Lindberg's behalf, said that early in 1931 they were present during a conversation between Lindberg and Seger wherein Lindberg told Seger that he would not again make the same mistake that he made before in assigning his patents to the corporation, and that Seger replied that he thought Lindberg was right and did not want him to make the same mistake again.

In this connection, the testimony of Mr. William F. Freudenreich, a disinterested witness, becomes of considerable importance. Freudenreich was a patent attorney who had rendered services for Lindberg. His experience as a patent lawyer had extended over 36 years. He knew both Lindberg and Seger, and testified that during 10 or 12 years prior to the trial he had filed about a dozen patent applications for Lindberg or the old Whelco Company. He was consulted by Lindberg with reference to the first patent in question about February 14, 1931, and charged Lindberg personally for all legal services in connection with the securing of these patents and had billed him for services and disbursements. At no time had he sent a bill to Lindberg Machine Works for services or expenses in connection with either of these patents. He testified that he received the first money for services or expenses in connection with the patents involved, on February 26, 1931. Lindberg made him a payment of $50. Plaintiff in its complaint alleged certain payments to Freudenreich totaling $596.30, and attempted to prove that all this

money was paid for fees and expenses in connection with the two patents. Freudenreich testified in detail as to each payment made, and the proof is uncontradicted that out of the sum of $596.30 only $290.80 was paid on account of the two patents involved in this case, and the remainder of $305.50 was paid on other indebtedness of Lindberg to Freudenreich for other patent work. Lindberg was quite positive in his testimony that the expenses of securing the patents in question were to be charged to his account with the company, and since there was an agreement on the part of the corporation to pay Lindberg a salary of $60 a week, it is reasonable to suppose that these service charges and other personal obligations were paid by the company from time to time and charged to Lindberg's account.

Freudenreich testified further that while he was working on the first of the two patent applications in February, 1931, Lindberg and Seger visited his office together; that Freudenreich then told Seger and Lindberg that he was glad that the latter did not commit the mistake of assigning his patents to the new company that was to be formed or which had just been formed, and that Seger replied that that was a very wise thing on Lindberg's part; that a year or two later when Seger was in Freudenreich's office Seger told him that a question had arisen as to granting a license under one or both of the patents in controversy to some eastern concern, and Seger inquired whether or not the company could grant such license, whereupon Freudenreich told him that the corporation could not do so without Lindberg's consent, because it simply had a shop right which did not allow the company to grant a license, but only to manufacture. These conversations were not denied by Seger.

Considering the fact that Lindberg had had an unfortunate experience only a short time prior to the incorporation of the Lindberg Machine Works, in assigning patents to the Whelco Company, which went

into bankruptcy, with a consequent loss of his interest in all these patents to Lindberg, and the fact that Lindberg had subscribed from three to four times as much from his own funds for stock of the Lindberg Machine Works as had Seger, it is highly improbable that Lindberg would have also agreed to assign his interest in the one patent for which application had been made before the incorporation and the second patent which was an improvement on the first and was not applied for until more than two years later and could not well have been in contemplation at the time Lindberg Machine Works was incorporated. Freudenreich's testimony corroborates Lindberg's testimony and the specific denials that Lindberg made all through his testimony that any such alleged agreement as plaintiff has contended for was ever made; the least that can be said with reference to this conflict on the important factual question in the case is that it is subject to grave doubt. Even the master who heard the evidence did not find that a specific agreement had been made, but merely stated that "it had been contemplated between the parties, that the said Bernhard Lindberg would assign the aforementioned patents to the plaintiff company," and that "Lindberg had promised, from time to time, to assign said patents to the said company." No date is fixed by the master as to when these promises were made, and none of the details of the agreement is set forth. Under the state of facts in the record it is difficult to conceive of any valuable consideration that passed from the incorporators to Lindberg which would have induced him to make .such an oral contract, and none is suggested by plaintiff. In this connection it is also significant to note that although the oral agreement for which plaintiff contends is alleged to have been made before the company was organized, no mention is made of these patents in the application for a charter, and in fact all the capital stock was paid in cash, most of which was furnished by Lindberg, himself. It should also be

noted that the bill in which plaintiff sought a decree finding that title to these patents belonged to it was not filed until more than 5 years after the date of the alleged oral agreement, and many months after Lindberg had severed his connection with plaintiff.

The law is well-settled that a court of equity will not decree specific performance unless the proof is clear and satisfactory, both as to the existence of an agreement and as to its terms, and unless the agreement is founded upon an actual and valuable consideration. Courts have repeatedly and consistently enunciated this doctrine in the strongest terms. In *Joliet Mfg. Co. v. Dice*, 105 Ill. 649, defendant was employed under an agreement by virtue of which he was to work for the best interests of the company, and that any improvements made by him should belong to the company. While so employed he designed an attachment to a machine for planting corn and subsequently superintended the manufacture thereof. Litigation arose as to Dice's rights under the improvement, and in commenting on the rule hereinbefore set forth, the court said that where a mechanic, in laboring for an employer in the construction of a machine, invents a valuable improvement the invention is the property of the inventor and not that of his employer. The claim of Seger in the case at bar, that he and others helped Lindberg in making drawings in connection with these patents under Lindberg's direct supervision would not alter this rule of law. The ideas for the patents were clearly those of Lindberg. The reason for the rule is emphasized by the court in the *Dice* case as follows (pp. 651, 652): "But the law inclines so strongly to the rule that the invention shall be the property of its inventor, that nothing short of a clear and specific contract to that effect will vest the property of the invention in the employer, to the exclusion of the inventor."

It is, of course, conceded by Lindberg that plaintiff has shop rights in these patents, and the law is clearly

to the effect that where an employee who finds and improves a method of, or instrument for, doing his work, using the property or labor of his employer to develop his invention into practical form by assenting to the use of such improvement by his employer grants to him an irrevocable license to use the invention. It was so held in the recent case of *Chicago Daily News, Inc. v. Kohler,* 360 Ill. 351, and cases cited therein. In the *Daily News* case, however, the court did not say that the employer is entitled to an assignment of the patents in the absence of a special agreement, and such is clearly not the law as shown in the numerous decisions cited in defendant's brief.

The case of *Dalzell v. Dueber Watch Case Mfg. Co.,* 149 U. S. 315, is one of the leading cases relating to the rights of employer and employee in and to patents developed and invented by the employee, and it contains some pertinent observations relating to the right of specific performance of a contract which are applicable to the case at bar. In that proceeding Dalzell was hired to do experimenting upon inventions regarding machinery and tools to be used in the manufacture of various portions of watch cases. His employer contended that Dalzell had agreed that any invention or improvement made or contributed to by him should be patented at the expense of the employer, and for its benefit exclusively, and that he would execute assignments thereof upon the issuance of any such patents. In commenting on the evidence, the court said, quoting from *Colson v. Thompson,* 2 Wheat. 336, 341, that, "if the contract be vague or uncertain, or the evidence to establish it be insufficient, a court of equity will not exercise its extraordinary jurisdiction to enforce it, but will leave the party to his legal remedy," and made the further comment that "it may well be doubted whether, if such a contract were satisfactorily proved to have been made, a court of equity would not consider it too unconscionable a one between employer and employed, to be spe-

cifically enforced in favor of the former against the latter.''

In *Pressed Steel Car Co. v. Hansen,* 137 Fed. 403, suit was brought by the employer against its employee to compel an assignment of certain applications for patents made by him when in the company's employ as chief engineer. Plaintiff contended that it was a condition of his employment and in part consideration of the salary paid him, that all designs, inventions and improvements that he might make or develop and all letters patent obtained by him should become the sole and exclusive property of plaintiff. The agreement, as here, was alleged to have been oral and there was also a great deal of conflicting testimony. In passing on the case the court said (p. 406) : ''The bill being for specific performance of a contract, such contract must be clearly and unequivocally proved, as stated. As proved, its terms as to subject-matter, consideration and all other essentials must be explicit and unambiguous.''

In *Fleischman v. Moore,* 79 Ill. 539, the court under similar circumstances held that ''upon examination, we do not find that any such contract as complainant alleges in his bill is proven to have existed between the parties by that clear preponderance of evidence which the law undoubtedly requires before a court of equity will decree a specific performance. Indeed, the evidence in the case leaves the mind in great doubt as to what was really the contract between the parties. . . . The contract insisted upon is too indefinite, and the proof too unsatisfactory, to support a decree for specific performance, and the court very properly dismissed the bill.''

Numerous other decisions cited by defendant are to the same effect, and it is not seriously contended that the law is otherwise.

With reference to Lindberg's counterclaim for salary, the evidence is likewise in conflict. Plaintiff concedes that it had agreed to pay Lindberg $60 a week, but only in the event that it could afford to make such payments,

and the fact that Lindberg served as president for some 5 years without asserting his claim lends color to the contention. However, it was conceded by plaintiff that the company owed him $368.85, which the master found to be due, and the decree should be affirmed as to this item.

During the pendency of this bill a motion was made by appellee for dismissal of the bill. That motion is now denied.

We are of opinion that as to the main litigation the evidence and the circumstances disclosed by the record would not warrant a decree in favor of plaintiff. Therefore the decree of the superior court is reversed with directions to dismiss the complaint and amended and supplemental complaint for want of equity; that a money decree be entered in favor of Lindberg and against plaintiff for $368.85 on his counterclaim, and that costs be assessed against plaintiff.

*Decree reversed and remanded with directions. Judgment for defendant on counterclaim in amount of $368.85.*

SULLIVAN, P. J., and SCANLAN, J., concur.