Velsicol Corporation, Appellee, v. Julius Hyman, Appellant.

Gen. No. 44,593.

NIEMEYER, J., dissenting.

Opinion filed June 20, 1949. Re-hearing denied July 1, 1949. Released for publication July 18, 1949.

HOPKINS, SUTTER, HALLS, DE WOLFE & OWEN, WILK-INSON, HUXLEY, BYRON & HUME, and BELL, BOYD & MARSHALL, all of Chicago, for appellant.

Poppenhusen, Johnston, Thompson & Raymond and Follansbee, Shorey & Schupp, all of Chicago, for appellee; Floyd E. Thompson and Clyde E. Shorey, both of Chicago, of counsel.

Mr. Presiding Justice Feinberg delivered the opinion of the court.

Plaintiff filed its complaint October 15, 1946, against defendant for specific performance, to compel defendant to assign four pending applications for patents and for injunctive relief to restrain him from using or disclosing to others processes, formulas and products covered by said patents. Defendant filed his answer. Upon a reference to a master to report his conclusions of fact and law, the master recommended a decree in favor of complainant, in accordance with the prayer of the complaint, to which exceptions were filed. The court entered a decree approving the master's report, directing specific performance, and granting the injunctive relief as prayed for in the complaint.

The complaint declared upon a written contract between defendant and plaintiff and alleged that by said contract defendant was obligated to assign to plaintiff any and all inventions, improvements, discoveries, formulas or processes relating to resins, insecticides, or any other chemical derivative of hydrocarbon oil or catalysts for the conversion of hydrocarbon oil, or any ingredient or product thereof, or to the manufacture or production of the same, invented, discovered or learned by the defendant during the term of his employment by the company; that the same shall be the sole and absolute property of the plaintiff, and the plaintiff to be the sole and absolute owner of all patent or other rights in connection therewith; and that during the term of employment of defendant by plaintiff, and after the termination thereof, defendant will keep all of the same secret from anyone except the company, and will also keep secret all processes, inventions and

formulas made known to defendant by the company, or any of its officers or employees, or learned by him while in the employ of plaintiff. The complaint alleged "on information and belief" that the defendant signed such an agreement in the form set out in the complaint "or in a substantially similar form"; that whether the defendant signed such an agreement as set forth in the complaint, he was nevertheless bound by the terms thereof by virtue of his employment by plaintiff to invent and carry on experiments and research work, and by virtue of his fiduciary relation to the plaintiff. It is the theory of the plaintiff that the facts alleged in the complaint constitute a fiduciary relation, out of which springs an implied contract on the part of the defendant to assign to the plaintiff the four pending applications, in which defendant is described as the inventor and which are the subject of the dispute in the instant case.

The master specifically found that defendant signed the written contract on January 31, 1931, as alleged in the complaint, and that there also existed an implied contract, by virtue of a fiduciary relation between defendant and plaintiff, to assign the patent rights described in said four pending applications for patents. The chancellor, in a written opinion filed in the cause, found that the defendant signed such a written agreement, and that there also existed an implied contract arising out of a fiduciary relation.

██ It appears to be the settled rule in Illinois that an implied contract cannot exist where there is a written one covering the same subject matter. It is only where the parties do not expressly agree that the law implies a promise. *Siegel v. Borland,* 191 Ill. 107, 112.

In *Brougham v. Paul,* 138 Ill. App. 455, this court followed the rule laid down in *Siegel v. Borland, supra,* citing a number of other Illinois cases to the same effect, and at page 461 said:

"The same doctrine was announced in *Walker v. Brown,* the first case cited *supra* [28 Ill. 378], and has never been departed from in this state. Such also is the law in other jurisdictions in this country and in England."

In *Booker v. Wolf,* 195 Ill. 365 at page 370, the court said:

"It is true that the law will not imply an agreement in the presence of an express contract of the parties . . . ."

Plaintiff has not cited any reported case in Illinois to the contrary. In *Rotan v. United States,* 43 F. (2d) 232, 236, the court said:

"It is fundamental that an express contract and an implied contract are mutually exclusive of each other."

In *Phoenix Lumber Co. v. Houston Water Co.,* 94 Tex. 456, 61 S. W. 707, the court said:

"If there was an express contract, there could be no implied contract arising out of the acts of performance of it. The one is destructive of the other."

█ Under our Practice Act, a pleading may allege in the alternative a written contract and an implied contract, but the proof must be of one or the other, and the court must determine which the proof establishes. It cannot, under the authorities cited, hold that a written contract and an implied contract covering the same subject matter exist simultaneously.

It becomes necessary to determine from this record whether the master and the court by its decree were justified in finding that defendant had signed a written contract, as alleged in the complaint. If the defendant signed such a contract, the terms are clear and the obligation is fixed, and there is no need for determining whether a fiduciary relation existed and an implied contract resulted. The sworn complaint alleges only upon information and belief that defendant signed

such a contract. The date of such contract is not alleged in the complaint. The defendant denied that he signed such an agreement. He testified that he refused to sign such an agreement, and in this he was corroborated by other witnesses. The evidence is voluminous, and the record contains many exhibits.

Plaintiff introduced in evidence a contract signed by defendant, identified in the record as exhibit 91. The agreement is between the Transo Envelope Company and defendant and is dated January 31, 1931. It recites that the undersigned (defendant) has been or is about to be employed by Varnoil Corporation (the original name of plaintiff company), and as a part of his employment will be engaged in discovering and developing and inventing processes, formulas and methods relating to window envelopes; that from time to time there would be imparted and disclosed to the undersigned secret processes and formulas used in connection with such window envelopes; that, therefore, in consideration of said employment and salary from time to time paid to the undersigned, he agrees that any and all inventions, improvements, discoveries, formulas or processes relating to window envelopes, or to the manufacture thereof, will at once be fully disclosed by the undersigned and will be the sole and absolute property of the company, and the company will be the sole and absolute owner of all patent and other rights in connection therewith. Up to this point in the contract it is obvious that his obligation to the Transo company is made definite and clear and refers to the subject of the window envelopes, which the Transo company was manufacturing and producing. The contract then provides in paragraph No. 2:

"The undersigned hereby agrees that at all times, both during his employment and after the termination of his employment he will keep secret all processes, inventions and formulas made known to him by the Company or Varnoil Corporation, or any of the officers or

employees  . . . , or learned by him while so employed  . . . ."

The absence from this agreement of any provision that inventions discovered should be the property of the Varnoil Company is a very potent fact to support defendant's position that he never signed a contract with plaintiff, as alleged in the complaint. If it was the intention of the parties that during defendant's employment his discoveries in plaintiff's laboratory, and all inventions in connection therewith, should become the sole property of plaintiff, it would have been a comparatively easy matter to include and clearly express such intention in exhibit 91. It was a contract prepared by the attorney for the Arvey and Transo companies, and the same attorney who incorporated plaintiff. It will be remembered that the master found that the contract set up in the complaint was dated January 31, 1931, the same date as exhibit 91. There is no explanation in the record as to why, if defendant actually signed the agreement set up in the complaint, there was any need for the reference to the Varnoil company in exhibit 91.

The proof mainly relied upon by plaintiff, for the establishment of a written contract signed by defendant, appears in the testimony of Regenstein and Schneider, neither of whom claim to have seen the defendant sign the agreement in question. They testified that they saw the agreement with his signature on it approximately 15 years previously, and that it was witnessed by two attesting witnesses. At the time of the hearing these attesting witnesses seemed available to plaintiff and could have been called as witnesses, but no effort was made to account for the failure to produce either of them as witnesses. The alleged agreement was not produced upon the hearing. The rule is that where a party to the suit has the burden of proof and has it within his power to produce wit-

nesses present at an occurrence, and he fails to produce the witnesses or explain their absence, the presumption is against him. *Hopkins v. Loeber,* 332 Ill. App. 140; *Tepper v. Campo,* 398 Ill. 496, 505.

■ ■ It seems strange, indeed, that plaintiff, relying upon a written agreement alleged to have been signed by defendant, and knowing at the time it filed its complaint that it did not have possession of the written instrument, made no reference by appropriate allegation to the fact of a lost instrument, if it was lost, or that it was destroyed, or was not accessible to it. Section 36 of the Practice Act [Ill. Rev. Stat. 1947, ch. 110, par. 160; Jones Ill. Stats. Ann. 104.036] provides that whenever an action, defense or counterclaim is founded upon a written instrument, a copy thereof, or of so much of the same as is relevant, must be attached to the pleading as an exhibit or recited therein, unless the pleader shall attach to his pleading "an affidavit stating facts showing that such instrument is not accessible to him." It would logically follow that the absence of such an affidavit, required by this section, should militate against plaintiff's position upon the hearing, that it could not produce the written instrument declared upon, when it knew at the time it filed its complaint that the same was not accessible to it. Under these circumstances and in the state of the evidence as we find it, we are compelled to hold that the finding of the master and the decree of the court, that a written agreement was signed by defendant, as alleged in the complaint, are against the manifest weight of the evidence. *Whipple v. Carrico,* 305 Ill. 164, 169; *Mould v. Rohm,* 274 Ill. 547, 555. The fact that the master and the court found that there existed a written agreement as alleged in the complaint, as well as an implied contract, contrary to the rule in *Siegel v. Borland, Brougham v. Paul, Rotan v. United States,* and *Phoenix Lumber Co. v. Houston Water Co., supra,* suggests an uncertainty in the minds of the

master and the court as to which of the two the evidence established. When such an uncertainty exists, there is not that clear proof as to the existence of the written contract which the rule in specific performance requires. *Lindberg Machine Works v. Lindberg*, 305 Ill. App. 543, 551; *Joliet Mfg. Co. v. Dice*, 105 Ill. 649.

In support of its position as to an implied contract, plaintiff earnestly argues that it was organized to do special research work in chemistry and maintained a laboratory for that purpose; that defendant was employed for the specific purpose of making discoveries and developing formulas; that he knew that every employee of plaintiff company working in the laboratory, having anything to do with the discoveries and formulas, was required to sign a so-called secrecy agreement by which he obligated himself to assign to the company all inventions and discoveries and to keep secret what knowledge he obtained in connection therewith; that during the course of conduct over a period of 15 years between plaintiff and defendant, in the prosecution of the work in said laboratory and in the development of plaintiff's business, defendant had assigned over 39 patents and pending applications for patents developed by him alone or in conjunction with other employees in the laboratory; that defendant being an officer and director of the company, as well as stockholder and employee, there arose from that course of conduct and practice between the parties a fiduciary relation and an implied agreement on the part of defendant to assign to plaintiff any and all patents and patent rights discovered and developed in the laboratory of plaintiff, in connection with which the facilities and material of plaintiff were used, and the discoveries, formulas and patents perfected at the expense of plaintiff.

Plaintiff emphasizes, that all other employees were required to sign secrecy agreements and execute assignments when applications for patents were made,

therefore the defendant, being also an employee and having followed the practice in assigning 39 patents, must be regarded in the same class or category as the other employees. There must be considered in opposition to this contention, that defendant's initial employment, as shown by the minutes of the board of directors, was at a salary of $40 per week, to be in full compensation for all services rendered by him as vice president or otherwise. There was no formal contract of employment shown. The by-laws prescribed the usual duties of a vice president and such additional duties and powers as the directors may prescribe. No other provision was made by the board of directors. Regenstein testified that defendant was one of the executive heads of the company, in charge of the operations of the company as well as its office, and that Schneider, the president of the company, had substantially the same duties. It is significant that Regenstein and Schneider, who occupied executive positions, signed no secrecy agreements prior to defendant's resignation. Defendant, who occupied an executive position and worked under no specific contract of employment, signed no such alleged secrecy agreement. That fact furnishes considerable basis for the position taken by defendant that he was not regarded as an employee and, therefore, signed no such alleged secrecy agreement.

Considerable stress is laid by plaintiff upon the fact that defendant had, in the course of his employment, over a period of 15 years, assigned 39 or more patents in the prosecution of his work and the superintendence of the laboratory of plaintiff, and that such fact is definite evidence of the intention of the parties that all discoveries and inventions by defendant should be the property of plaintiff. This fact, stressed, is satisfactorily explained in the position of defendant, disclosed by the testimony, that he had salary increases during that period from $40 a week to $600 a week;

that he had a 20 per cent stock interest in the company, the value of which he was anxious to increase and, therefore, voluntarily assigned such 39 patents to plaintiff; that when defendant on a number of occasions demanded of Regenstein, who was in control, that he adjust and increase defendant's stockholdings in plaintiff company, and when Regenstein failed to keep his promise to do so, it was then that defendant refused to assign the four pending applications for patent in question and resigned as an officer of plaintiff. Furthermore, the rule seems clearly established by many cases that prior assignments by an employee are not controlling and do not necessarily establish an agreement, implied, to assign present or future inventions. *Pressed Steel Car Co. v. Hansen,* 137 Fed. 403; *Bowers v. Woodman,* 59 F. (2d) 797; *Lambert Tire & Rubber Co. v. Brubaker Tire Co.,* 5 F. (2d) 414; *Fuller & Johnson Mfg. Co. v. Bartlett,* 68 Wis. 73.

To us it seems clear from this record that defendant came to Regenstein with the two "polymer" discoveries for which patents were obtained, and which were expressly referred to in the resolution adopted by plaintiff's board of directors on January 29, 1931; that the 39 patents assigned by defendant to plaintiff company, over the period of 15 years of his association with plaintiff, did not relate to insecticides covered by the four pending applications in question, which claim a wholly new discovery relating to insecticides; that the "polymer" discoveries assigned to plaintiff had no reference to insecticides discovered and perfected many years later.

We have no quarrel with the rule laid down in the cases cited by plaintiff that where one is specially employed to discover and develop a specific invention, using the facilities and material of his employer, and the invention is ultimately perfected at the expense of the employer, in equity and good conscience it becomes the property of the employer; that there is an implied

contract on the part of such employee to assign the patent or patent rights to the employer, and he can be compelled to do so by specific performance.

It was for the development and further research in connection with the "polymer" discoveries, having to do with drying oils in the manufacture of paint and varnish (which the original name of plaintiff company, Varnoil, connoted), that defendant was employed. His subsequent chemical discovery and development relating to insecticides was not in the contemplation of the parties when the defendant assigned his polymer inventions to plaintiff and was given stock in payment therefor. The instant case, we think, is governed by the holding in *Joliet Mfg. Co. v. Dice,* 105 Ill. 649, followed in *Lindberg Machine Works v. Lindberg, supra.* Plaintiff argues there is a clear distinction upon the facts between the *Joliet* case and the instant one. We cannot agree with its reasoning. In the case cited the complaint was for specific performance to compel an assignment by the defendant of an invention for a device in the construction of what were called "check rowers," of which the defendant was the original inventor. Upon a final hearing the trial court granted the relief. The Appellate Court (11 Ill. App. 109) reversed with directions to dismiss the complaint, from which an appeal was taken to the Supreme Court. The agreement in that case was in writing and contained the following language:

"The said Andrew F. Dice agrees to work for the company named for the term of five years, from the 1st to the 15th of November next, in such capacity pertaining to the manufacturing of shellers and powers, and disposing of the same, as the company may consider for their best interest, as may be assigned by the president of the company; that he will work for the best interest of the company in every way that he can, and in whatever way such aid can be given shall belong

to the company,—that is, improvements . . . that he may make or cause to be made.''

The complaint alleged that shortly after the agreement the complainant added to its business and the manufacturing of ''check rowers'' (an attachment to a machine for planting corn), and that defendant was assigned to the superintendence of the manufacture of ''check rowers'' and entered upon this employment ''as part of and in performance of'' the above agreement, and so continued for some months; that during this service defendant made known to complainant that he had conceived an improvement in ''check rowers,'' and upon defendant's suggestion complainant directed him to employ his time in the interests of the company in perfecting the invention for its benefit, complainant furnishing the materials and mechanical labor in experimenting and perfecting the improvement, and that this was done; that defendant was receiving full pay for his time and services, according to the terms of the written contract; and that the invention was perfected and developed and the proper subject for a patent.

Defendant answered that complaint claiming to own the invention. The Supreme Court said, ''the proofs tend to sustain the allegations of the bill, and also to show that Dice, while at work in making experimental structures in the shops of complainant, said that the improvement in the 'check rowers' was being wrought out for the benefit of the complainant''; that there was some dispute in the testimony as to this statement. The Supreme Court further said at p. 651:

''Assuming the facts to be as claimed in the bill, we think the decree of the circuit court was properly reversed. The general rule is, that where a mechanic, in laboring for an employer in the construction of a machine, invents a valuable improvement, the invention is the property of the inventor, and not that of his employer. It may be true that where the employer hires a man of supposed inventive mind to invent *for*

*the employer* an improvement in a given machine, under a special contract that the employer shall own the invention when made, and under such employment such improvement is invented by the person so employed, such invention may, in equity, become the property of the employer. *But the law inclines so strongly to the rule that the invention shall be the property of its inventor, that nothing short of a clear and specific contract to that effect will vest the property of the invention in the employer, to the exclusion of the inventor.* (Italics ours.) . . . The only specific contract set up is the written contract. That provides, in substance, that future improvements in the manufacture of *'shellers and powers'* to be made by Dice, 'shall belong to' complainant.

"It is said that the provision of the written contract, 'that he will work for the best interests of the company in every way that he can,' and that such aid, in whatever was given, 'shall belong to the company,—that is, future improvements that he may cause to be made,' —is broad enough to include the invention of the improved 'check rowers.' Taken in connection with the context,—the preceding provisions,—these words clearly have reference only to improvements to be made in 'shellers and powers,' and have no reference to 'check rowers.'

"Nor do we think that when Dice consented to devote part of his time in superintending the manufacture of 'check rowers,' and also to devote part of his time to the making of an improved 'check rower,' he thereby necessarily contracted that the invention, when perfected, should be the exclusive property of the complainant."

Though the evidence in the case cited, heard by the chancellor, tended to prove that defendant was directed and entrusted by his employer, as a part of his employment, to superintend the work of perfecting an

invention in "check rowers" and to employ his time in the interests of the company in perfecting it for its benefit, and paying him therefor, and though the proofs tended to sustain the allegations of the complaint that defendant, while at work in making experimental structures in the shops of complainant, said that the improvement in the "check rowers" was being wrought out for the benefit of the complainant, yet the Supreme Court in the case cited held that neither the complaint nor the evidence established a "specific contract" that defendant should invent an improved "check rower," the invention of which should be the property of the complainant, and that the only specific contract was the written contract set up in the complaint. There is a definite parallel between the facts and claims of a written contract and a fiduciary relation made in the case cited and those in the instant case. The reasoning in *Dalzell v. Dueber Watch-Case Mfg. Co.*, 149 U. S. 315, also supports our views expressed. To the same effect is *Pressed Steel Car Co. v. Hansen*, 137 Fed. 403, and *Fleischman v. Moore*, 79 Ill. 539.

The "shop rights" doctrine declared in a number of cases would be the one applicable in the instant case. That doctrine is to the effect that where an employee, who finds and improves a method of, or instrument for, doing his work, using the property or labor of his employer to develop his invention into practical form, by assenting to the use of such improvement by his employer grants to him an irrevocable license, without royalty, to use the invention. *Lindberg Machine Works v. Lindberg, supra,* at page 551; *Chicago Daily News, Inc. v. Kohler,* 360 Ill. 351.

It would unduly extend this opinion were we to discuss in detail the testimony of the various witnesses. We have examined the evidence carefully and have concluded that upon the state of the record plaintiff has failed to sustain its burden of proof that there

either was a written or implied contract, as alleged in the complaint.

It follows from what we have said that the findings of the master and the decree of the court are against the manifest weight of the evidence, and that the chancellor should have entered a decree dismissing the complaint for want of equity.

Accordingly, the decree is reversed and the cause remanded with directions to dismiss the complaint for want of equity.

*Reversed and remanded with directions.*

Tuohy, J., concurs.

Niemeyer, J., dissents. A statement of certain uncontested facts is necessary to an understanding of the issues presented on the appeal.

Defendant, a chemist, with degrees from the University of Chicago and the University of Leipzig, returned to Chicago in 1924; before his connection with plaintiff he was employed by the International Filter Company as a research chemist, by the Transo Envelope Company (hereafter called Transo), organizing and equipping a laboratory, and by the Pure Oil Company as a research chemist; with each of these companies he signed a patent assignment agreement. In November 1930, after leaving the Pure Oil Company, he filed two applications for patents relating to polymers, a waste product derived from the refining of petroleum; needing capital for the commercial development of his ideas, he interested Joseph Regenstein, his cousin and the principal stockholder and executive officer of the Arvey Corporation (hereafter called Arvey) and of Transo; after Regenstein had obtained a report on defendant's product from the chief consulting chemist of Transo, he, defendant and F. P. Schneider, the second largest stockholder in Transo, had a meeting, and as a result plaintiff corporation was organized in January 1931 as the Varnoil Corporation (changed to Velsicol Corporation in

1932), with a capital stock of $20,000, consisting of 200 shares of $100 each. Arvey and Transo each took 40 per cent of the stock, paying for their respective shares $8,000. Defendant acquired 20 per cent in consideration of the assignment of his patent applications at a valuation of $4,000. Regenstein became president, defendant vice-president, and Schneider secretary and treasurer. They retained their respective positions throughout all the transactions involved herein. Defendant was the operating head, managing the day to day operations of the business, supervising and directing the research and experimental work and the commercial development of the various products and patents of the company until his resignation in September 1946. He received therefor a salary, increased from $40 a week to $600 a week. Regenstein was the financial head and continually conferred with defendant as to the business of the company. Pending the organization of plaintiff, defendant hired two chemists, Forbis and Harter, and an assistant chemist, Mayer, a first cousin of Regenstein and defendant, who worked under defendant's direction in a laboratory located at the rear of the Arvey plant and later taken over by plaintiff. On January 30, 1931, after the organization of plaintiff, these three employees signed agreements (hereafter referred to as patent assignment agreements) requiring them to assign to plaintiff any new inventions they might discover, either in the product itself or anything relating thereto, or the process for using it, and also to keep secret any knowledge they might obtain while working for the corporation. These agreements were prepared by Mr. Schupp, the attorney for the company and for Arvey and Transo. It was customary to put men who went into a laboratory under such agreements. Throughout his connection with plaintiff, defendant insisted that all persons working in the laboratory and the manufacturing plant of plaintiff at Marshall, Illinois, including

Colonel Behrman, who came with the company as vice president and director of research, should sign a patent assignment agreement. Forbis, Harter and Mayer were also doing some work for Transo under the direction of defendant. They signed a patent assignment agreement with Transo. On January 31, 1931, defendant signed a like agreement with Transo. Whether defendant at the same time signed an agreement with plaintiff is the important question of fact presented on appeal.

The various patent assignment agreements were placed in envelopes, marked "Transo" and "Varnoil" and kept in the safe of Transo until 1938 or 1939, when the envelope containing the agreements with plaintiff were turned over to Regenstein, who placed them in a cabinet in the anteroom of his office where Griffin, employed by Regenstein in 1935, had custody of them until he went into the army in 1942. After that Miss Sims, who became defendant's wife June 17, 1944, had custody of the agreements. The office and laboratory of plaintiff were moved to East Pearson street in 1942. At that time the patent assignment agreements were transferred to the new office and were under the general control and direction of defendant. Through the year 1939, with the exception of 1935, plaintiff operated at a loss each year. This loss and the costs of the plant erected at Marshall, Illinois, were met by Transo and Arvey in equal parts. At the end of 1939, plaintiff was indebted to them in the sum of $528,000. This amount was still owing when this suit was instituted. The moneys received by plaintiff were expended under the direction of defendant. Up to and including July 10, 1943, a period of more than 12 years, 38 applications for patents were filed by plaintiff. In 37 of these applications defendant appears as the inventor. All were assigned to plaintiff before being filed in the patent office. They were assigned as a matter of routine and without discussion with any person con-

nected with plaintiff. Five of them covered insecticides. October 16, 1943, an application for a patent was filed in which defendant and Peters, another employee of plaintiff, were named as the inventors. In September or October, before the filing of the application, at a party at Regenstein's home, defendant in a discussion with Regenstein made his first objection to assigning patents. They do not fully agree as to what was said. Regenstein insisted that the application should be assigned. It was assigned by defendant and Peters. In 1944, applications were made for two patents covering insecticides which defendant as inventor assigned to plaintiff. In March 1945, and January, May and July 1946, four applications for patents covering composition of matter and production of resinous compositions were filed on applications assigned to plaintiff. In these applications employees other than defendant appear as the inventors. In July 1945, and January and February 1946, defendant filed four applications for patents covering insecticides. These are the patents involved in this litigation. The discoveries and inventions described in these applications are related to and based in part on the application made in March 1945, and were worked out and developed in the laboratory of plaintiff by its employees working under the direction of the defendant. Approximately $150,000 of plaintiff's funds were expended under the defendant's direction in the development and promotion of these applications. Defendant refused to assign them to plaintiff. The parties agree that they are worth five million dollars. Defendant resigned as vice president in September 1946, and as director in the month following.

The complaint, filed October 15, 1946, alleges that at the direction of defendant every employee of plaintiff, from its organization down to the filing of the complaint, was required to sign and did sign a patent assignment agreement in the form set out verbatim in

the complaint, or a form of substantially similar tenor used from time to time by plaintiff; that it became and was the duty of defendant to sign such an agreement; that all such agreements were at all times in the possession, control and custody of the defendant as the chief executive officer of plaintiff, and that plaintiff is informed and believes, and therefore charges the fact to be, that defendant did sign an agreement in the form set out in the complaint or in substantially similar form and is bound by all the terms thereof; that whether or not defendant actually signed such an agreement, he was, nevertheless, bound by virtue of his employment, etc. No objection to the form or substance of this allegation is made. Defendant answered, denying that he ever signed a patent assignment agreement and denied that he was bound by an implied agreement. No objection was made to the testimony offered by plaintiff tending to establish its allegations. The complaint therefore must be held sufficient to inform the defendant that the agreement claimed to have been signed by him was not in the possession of plaintiff but had at all times been in the possession, control and custody of defendant. The evidence conclusively shows that since the removal of the office of plaintiff to East Pearson street in 1942, defendant had the possession, custody and control of all patent assignment agreements. The master found that defendant signed a patent assignment agreement with plaintiff January 31, 1931. The court approved the finding. This court sets the finding aside as against the manifest weight of the evidence.

The finding of the trial court is based on the testimony of Regenstein and Schneider. In substance the testimony of these witnesses is that in the middle of February 1931, Schneider received two sets of patent assignment agreements signed by Forbis, Harter, Mayer and defendant, the men first connected with plaintiff's laboratory; one set of agreements was with

plaintiff and the other with Transo; the agreements in each set were identical, but the two sets of agreements differed slightly; each set of agreements was placed in a separate expanding envelope and filed in the safe in the office of Transo; as new employees were added their agreements were placed in the proper envelope; in 1938 and 1939, the agreements with plaintiff, including the agreement signed by defendant, were transferred to a cabinet in the anteroom in Regenstein's office, where they remained until transferred to the office of plaintiff on East Pearson street where they were under the supervision and control of defendant; that a search was made for the agreement of defendant with plaintiff but that it could not be found. In opposition to this testimony defendant testified that he told Regenstein and the attorney, Schupp, who was dead at the time of the hearing, that he would not be bound to assign patents to the company, but that they went ahead; that he refused to sign a patent assignment agreement presented to him by Schupp; that he never signed a contract or agreed orally to make any assignment; he denied signing a patent agreement with Transo January 31, 1931, until the contract was produced; he then admitted that he signed it but claimed to have no recollection of the circumstances under which he did so. Degginger testified that at a meeting relating to the organization of plaintiff in Schupp's office in December 1930 or January 1931, defendant refused to sign a patent assignment agreement. Defendant's wife testified that when she took charge of these agreements in 1942, there was no contract signed by defendant among those delivered to her. The interest of Regenstein and defendant and his wife is obvious. In addition to what has been heretofore stated, Schneider, at the time he testified, was president of plaintiff at a salary of $25,000, but had no stock or other financial interest in the company. He sold his interest in Transo in 1946. When Degginger testified,

he was a substantial stockholder in a new corporation defendant had formed after leaving plaintiff, and three of his sons were employed by the company. He had instituted a suit, making serious charges against Regenstein in the management of Arvey. This suit was compromised in 1942 by the sale of Degginger's stock in Arvey to the company. In addition to his interest, Degginger was probably prejudiced. In depreciating the testimony of Regenstein and Schneider the majority of the court stresses the fact that they did not see the defendant sign the agreement in controversy. The competency of these witnesses to recognize the defendant's signature was not questioned before the master by objection to their testimony or by cross-examination. Defendant concedes that Regenstein and Schneider were correct in their testimony as to the contract with Transo, signed by defendant on January 31, 1931, but before the contract was produced he denied signing it, as he still denies signing the missing contract. Each of the contracts in the two sets of agreements received by Schneider in February 1931 was witnessed by two persons. The evidence does not disclose who witnessed the missing contract signed by defendant. If it be presumed that it was witnessed by the same persons who witnessed defendant's contract with Transo, it was witnessed by Harter and Mayer. The majority of the court says that the failure of plaintiff to present these witnesses raises a presumption against it. The evidence shows that Harter died in 1931. Defendant testified that Mayer is in Chicago. As he is a first cousin of defendant, as well as Regenstein, and no longer has any connection with plaintiff, he is, apparently, equally available to both parties. It is extremely unlikely that a person whose only interest in a contract was to sign as a witness, would have any independent recollection of the fact after 16 years, and his testimony would be practically worthless unless refreshed by the production of the instru-

ment with his signature, or by some peculiar incident or occurrence to give special significance to the act of witnessing the contract. The well established rule announced in *Tepper v. Campo*, 398 Ill. 496, has never been extended to a factual situation similar to that presented here.

Turning to the question of the probability or improbability of the testimony, the facts and circumstances conclusively established support the testimony of plaintiff's witnesses. At the time plaintiff was organized defendant admits that he had very limited capital and needed capital association to make his ideas of any value. Regenstein and Schneider were experienced business men, and they, as well as their attorney Schupp, realized the importance of having persons connected with a research and experimental laboratory bound by patent assignment agreements in accordance with the custom testified to by defendant. It is unreasonable to believe that they would secure such agreements from minor employees and leave the man who had access to all information and directed and controlled the research and experimental work of all employees free to appropriate to himself the result of work and experiments financed by them. It is extremely unlikely that they would have advanced money in excess of $500,000 over a period of years for defendant's experiments if he had refused to sign a patent assignment agreement. At that time defendant's project was wholly speculative and Regenstein and Schneider would not have embarked on it without the protection they felt they needed from all persons connected with the laboratory. This is indicated by defendant's testimony that in September or October 1943, when defendant told Regenstein that he would not assign any more patents, Regenstein replied, "Well if that is the way you feel about it we may as well call the whole business quits right now." Regenstein and Schneider were in the dominant position and

as a practical matter defendant's necessity would have obliged him to accept what was offered rather than refuse a reasonable request, based on custom, that he sign a patent assignment agreement.

Defendant's subsequent conduct contradicts his denial of the signing of a patent assignment agreement. For more than 12 years, until the conversation in 1943 referred to above, defendant went along assigning applications for patents without discussing the question of patent assignments with anyone connected with plaintiff. In *Magnetic Mfg. Co. v. Dings Magnetic Separator Co.*, 16 F. (2d) 739, decided by the Court of Appeals for the Seventh Circuit, Bethke, an employee, made two improvements on a magnetic separator in the course of his employment and assigned them to his employer; he assigned a third invention to a competitor. In litigation relating to the last invention the court said:

"This action on the part of Bethke speaks louder than the testimony of any witness in the case. It is inconceivable that he would have thus transferred his applications for the patents, if he had not construed his contract of employment to be as appellee's president testified. Such a contemporaneous construction of the contract by Bethke's own action, at a time when there was no occasion to dissimulate, is most persuasive."

The majority of the court condemns the double finding of the master and the trial court of a written contract and an implied contract as a violation of the long established and well recognized rule that the law will not permit an action on an implied contract where the parties have entered into an express contract. In *People v. Dummer*, 274 Ill. 637, 641, the court said: "The only difference between an express contract and an implied contract in the proper sense is, that in the former the parties arrive at an agreement by words, either verbal or written, while in the latter the agree-

ment is arrived at by a consideration of their acts and conduct." It is not unusual for parties to expressly contract for the rights and obligations which the law would imply from the acts and relations of the parties. In such cases there is no conflict between the terms of the express and the implied contract. If there is a failure to prove the express contract, recovery may be had on an implied contract. *Moreen v. Estate of Carlson*, 365 Ill. 482; *Anderson v. Biesman & Carrick Co.*, 287 Ill. App. 507. As said in *Paley v. Du Pont Rayon Co.*, 71 F. (2d) 856: "It is immaterial in the case before us whether appellant's right to the assignment of the patent is traceable to a contract or to the nature of appellant's employment. Approached from either starting point, we arrive at the same conclusion." In the instant case the plaintiff, faced with the difficulty of proving a written contract which it could not produce, added an allegation that defendant was, nevertheless, bound by an implied contract. There being a conflict in the evidence as to the execution of a written contract, it was advisable, if not the duty of the master, to report on both theories of the complaint. It was sound practice for the trial court to make a finding as to the written and implied contracts, particularly where, as in *Paley v. Du Pont Rayon Co., supra,* "Approached from either starting point, we arrive at the same conclusion." Where, as here the same rights and obligations resulted from the written contract as from the implied contract, defendant cannot be injured by the double finding. The decree, if correct as to the relief granted, must be sustained, even though one of the findings as to the written or the implied contract may be unwarranted.

The four applications for patents involved herein related to insecticides, and the majority opinion holds in effect that insecticides were not in the contemplation of the parties when the plaintiff was organized and defendant transferred to it his two patent applications

relating to polymers and was employed by plaintiff, and that no implied agreement existed as to insecticides. Plaintiff was organized with broad powers to invent chemicals of all kinds, to invent personal property of every class and description and to apply for, purchase or otherwise acquire any letters patent or patent applications, etc. Defendant, as operating head of the company and the only stockholder or executive head having any knowledge of chemistry, directed the research and experimental work of the company. He also handled all patent applications. Of the 46 applications made and assigned to plaintiff during defendant's connection with plaintiff, all but six were made in defendant's name as inventor. One, the subject of the first controversy in regard to assignment of applications in October 1943, designated defendant and Peters, another employee, as the inventors. Defendant's relation with plaintiff, therefore, was entirely different from the relation of a workman in a factory or an employee engaged for a specific purpose or in a limited field. His position was one of trust and confidence in which he owed the corporation the strictest fidelity and the utmost good faith. Being charged with and having assumed the duty of procuring patents in the name of plaintiff on patentable inventions and discoveries of commercial value made or developed through the research and experiment of plaintiff's employees, including himself, he cannot claim for himself any of such inventions and discoveries. In *Houghton v. United States,* 23 F. (2d) 386, the court said: "The right of the employer to the invention or discovery of the employee depends, not upon the terms of the original contract of hiring, but upon the nature of the service in which the employee is engaged at the time he makes the discovery or invention, and arises, not out of the terms of the contract of hiring, but out of the duty which the employee owes to his employer with respect to the service in which he

is engaged." Also see *Standard Parts Co. v. Peck,* 264 U. S. 52, *Wireless Specialty Apparatus Co. v. Mica Condenser Co.,* 239 Mass. 158, and *Parker Rust-Proof Co. v. Allen,* 231 Mich. 69. In the years 1933, 1935, 1940, 1942 and 1943, before the first controversy arose relating to the assignment of patents, the defendant assigned patents covering insecticides. The defendant thereby gave a practical construction to and recognition of his obligation under his employment. The majority of the court quotes extensively from *Joliet Mfg. Co. v. Dice,* 105 Ill. 649, decided in 1883, in support of its position that defendant's application did not extend to insecticides. In that case the plaintiff's work in the development of the improvement in check rowers was alleged to have been done under the written agreement set out in the complaint. The Supreme Court decided the case upon its construction of the written contract and held that it was limited to improvements in shellers and powers and did not cover check rowers. The opinion was rendered before the development of research and experimental laboratories, and, as heretofore pointed out, defendant's relation to plaintiff is wholly different from an employee like Dice to his employer.

The testimony clearly and satisfactorily established the signing of the patent assignment agreement by defendant. It also clearly and satisfactorily established, independent of a written agreement, an implied obligation upon defendant to assign the patent applications involved herein to plaintiff. The decree should be affirmed.